R3M Law, LLP
437 Madison Avenue, 24th Floor
New York, NY 10022
646.453.7851
Howard P. Magaliff

*Proposed Attorneys for Atlas Land Holdings, LLC*
*and Goodbear Property LLC,*
*Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| ATLAS LAND HOLDINGS, LLC, | : | Case No. 26-10493-pgr |
| | : | |
| Debtor. | : | |
| | : | |
| EIN: 88-2163998 | : | |

------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| GOODBEAR PROPERTY LLC, | : | Case No. 26-10494- pgr |
| | : | |
| Debtor. | : | |
| | : | |
| EIN: 83-3089373 | : | |

------------------------------------------------------------x

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED CREDITORS, (E) SCHEDULING FINAL HEARING, AND (F) GRANTING RELATED RELIEF

TO THE HON. PATRICK G. RADEL,
UNITED STATES BANKRUPTCY JUDGE:

Atlas Land Holdings, LLC ("Atlas") and Goodbear Property LLC ("Goodbear",

and together with Atlas, the "Debtors"), debtors and debtors in possession, by their proposed at-

torneys R3M Law, LLP, respectfully submit this motion (the "Motion") for the entry of interim

1

and final orders: (1) authorizing postpetition financing and granting priming liens pursuant to 11 U.S.C. § 364(d)(1); (2) authorizing the use of cash collateral and providing adequate protection pursuant to 11 U.S.C. §§ 105, 361 and 363; (3) scheduling a final hearing pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Bankruptcy Rule (the "Local Rules") 4001-2, and (4) granting related relief, and state:

1.      On May 1, 2026 (the "Petition Date"), the Debtors filed voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").  The Debtors remain in possession of, and continue to manage their property as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or official creditors' committee has yet been appointed in this case.

2.      Information regarding the Debtors' history, operations and financial condition can be found in the Declaration of Jaclyn M. Iarossi Pursuant to Local Rule 2015-2 dated May 1, 2026 ("Iarossi Decl.").  [ECF doc. 3].

3.      The Debtors seek entry of interim and final orders authorizing them to obtain postpetition financing and approving their use of the cash collateral to continue their business operations and reorganization efforts including to maintain business relationships with vendors, suppliers and customers, to make payroll and payroll tax obligations, and to satisfy other working capital and operational needs.  Without a new revolving line of credit from First National Bank of Scotia ("FNBS"), their pre-petition lender and the ability to use cash collateral, the Debtors will not have sufficient liquidity to continue operations and reorganize their business during the pendency of these chapter 11 cases.

4904-2935-4901, v. 7

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I.     The Debtors' Prepetition Capital Structure

5.     Goodbear Holdings, LLC ("Holdings"), whose members were Jaclyn Iarossi ("Ms. Iarossi"), Saara Maherali ("Saara") and Alim Maherali ("Alim"), was the owner of the real property known as the Friends Lake Inn ("FLI") located in Chestertown, NY.  Through a series of pre-petition transactions, Saara and Alim transferred their interests in Holdings to Ms. Iarossi.  Ms. Iarossi formed Atlas on May 3, 2022 and is the sole member.  Holdings subsequently transferred FLI to Atlas.

6.     Goodbear was formed on December 20, 2018.  Goodbear's original members were Ms. Iarossi, with a 51% member interest, Saara, with a 24.5% member interest, and Alim, with a 24.5% member interest.

7.     On February 17, 2023, Atlas entered into an Amended and Restated Mortgage and Security Agreement (With Assignment of Leases and Rents) and Consolidation Agreement (the "FNBS Mortgage") and an Amended and Restated Mortgage Note in the amount of $4,140,304 (the "FNBS Note" and together with the FNBS Mortgage, the "FNBS Pre-petition Mortgage Loan") with First National Bank of Scotia ("FNBS").  As part of this financing, existing mortgage indebtedness of Atlas in the amount of $2,034,956.07 was assigned to FNBS, and FNBS advanced new money in the amount of $2,105,338.93.

3

8. In connection with the 2023 financing with FNBS, Saara sold her 24.5% member interest in Goodbear to Ms. Iarossi and Alim sold 15.5% of his member interest in Goodbear to Ms. Iarossi. As a result, Goodbear is owned 91% by Jaclyn Iarossi and 9% by Alim Maherali. As part of the 2023 FNBS financing, $1,564,365.79 was paid to Saara and Alim for their member interests in Goodbear.

9. Simultaneously with the mortgage loan to Atlas, Goodbear entered into a $100,000 revolving line of credit with FNBS (the "FNBS Pre-petition LOC") for working capital. Goodbear's obligations to FNBS are secured by a General Security Agreement, dated February 17, 2023 (the "Security Agreement") by and between FNBS and Goodbear, by which it granted FNBS a security interest in all of its assets as more fully set forth in the Security Agreement. The Security Agreement was duly perfected by filing a UCC-1 financing statement with the New York State Department of State on February 17, 2023.

10. Prior to the Petition Date, Goodbear also executed and delivered to FNBS an Overdraft Repayment Demand Note in the amount of $232,182.75 (the "Overdraft Note"), which was in replacement of, and not repayment of, Goodbear's obligations to repay the overdrafts it had incurred in its operating account as of the date of the Overdraft Note. Goodbear is obligated to repay the Overdraft Note pursuant to an Account Agreement dated February 13, 2023.

11. The FNBS Pre-Petition Mortgage Loan and the FNBS Pre-petition LOC were guaranteed by Ms. Iarossi, Saara and Alim.

12. By in or about April 2024, Atlas was in default under the FNBS Pre-petition Mortgage Loan and Goodbear was in default under the FNBS Pre-petition LOC. Pursuant to a Forbearance Agreement dated November 18, 2024 (the "Forbearance Agreement") between

FNBS as lender, and Atlas and Goodbear as borrowers, FNBS agreed to forbear from exercising any rights and remedies against the borrowers, Ms. Iarossi and the guarantors concerning the borrowers' obligations.  The Forbearance Agreement required Atlas to make monthly payments of $7,000 on the FNBS Pre-petition Mortgage Loan and for Goodbear to make monthly interest payments on the FNBS Pre-petition LOC.

13.     The Forbearance Agreement has terminated, but FNBS has continued to forbear from exercising any of its rights under its loan documents, including foreclosure, while the Debtors pursued a consensual sale of their business that would satisfy the bank's debt.  As a condition of FNBS' consent to the chapter filing, the Debtors' use of cash collateral, the DIP Loan and the Carve-Out (discussed *infra.*), the Debtors have agreed to retain a broker to sell FLI.

14.     As of April 30, 2026, the outstanding indebtedness of Atlas to FNBS under the FNBS Pre-petition Mortgage Loan is $4,867,746.38.  The outstanding indebtedness of Goodbear under the FNBS Pre-petition LOC and the Overdraft Note is $340,038.22.

II.     **The Need to Use Cash Collateral and for Access to Financing**

15.     The Debtors determined to file for relief under chapter 11 of the Bankruptcy Code due to their cash flow problems, which have prevented them from paying all of their debts on a current basis, in particular the secured loans to FNBS, which have been in default since April 2024.  The Debtors' cash flow issues stem from a downturn in their business.  The Debtors had been covering expenses through a combination of operating revenue and loans from the line of credit issued by FNBS to Goodbear and contributions from Ms. Iarossi.  Once the lending limit on the LOC was reached, funding deficits were met by FNBS allowing overdrafts on Goodbear's operating account.  The cash flow burdens had a significant adverse impact and

4904-2935-4901, v. 7

hampered the Debtors' ability to stay up to date with their tax obligations, resulting in the filing of a tax lien by New York State for unpaid occupancy taxes.

16.    As stated above, the Debtors need access cash collateral and new revolving line of credit to continue their business operations, maintain relationships with vendors, suppliers and customers, satisfy payroll and payroll tax obligations, and satisfy other working capital and operational needs.

### III.    Alternative Sources of Financing Are Not Readily Available.

17.    The Debtors do not have alternative sources of financing readily available. All of their assets are encumbered under their existing capital structure, which, along with the Debtors' uncertain financial condition, restricts the availability of, and options for, postpetition financing.

18.    The Debtors engaged in good faith, arm's length negotiations with FNBS, recognizing that they would need daily access to liquidity to fund their operations. The Debtors and their advisors negotiated over a number of weeks regarding the structure and economics of the proposed DIP Loan. *See* Iarossi Decl. ¶ 13.  Ultimately, the Debtors and FNBS agreed to a set of terms that will provide the Debtors with necessary access to liquidity during the pendency of these chapter 11 cases at fees and rates that the Debtors and their advisors consider to be reasonable under the circumstances. *Id*.

19.    The Debtors also sought financing from third-party sources before the commencement of these cases. The Debtors recognized that it would be difficult to secure financing because of limited time and because all of the Debtors' assets are encumbered by existing liens under their prepetition funded debt, and FNBS indicated that it would not consent to a

6

4904-2935-4901, v. 7

"priming" DIP financing provided by a third party.  Moreover, none of the lenders who the Debtors approached even offer debtor in possession financing.  Iarossi Decl. ¶ 12.

## RELIEF REQUESTED

20.     The Debtors seek entry of interim and final orders authorizing them to obtain post-petition financing from FNBS pursuant to a new revolving senior secured line of credit (the "DIP Loan") and approving their use of cash collateral.  For all intents and purposes the Debtors are without sufficient funds to operate their business for the 90–120 days following the Petition Date.  The Debtors' business is coming into the spring and summer wedding season, when bookings and revenues typically increase.

21.     The Debtors' expectation is that they will be able to generate gross revenues of approximately $79,936 and will have expenses of approximately $141,800 in the 30 days following the Petition Date, thus necessitating the need for debtor in possession financing.  Subject to approval of this Court, with the support of FNBS, the Debtors have hired Prestige Hospitality Group to manage Friends Lake Inn, and they expect to generate new and increased business and be able to provide numbers that are more precise in the coming months.  The Debtors are hopeful that the cash generated from their business will lead to a consensual chapter 11 plan based upon a sale of their assets.

## CONCISE STATEMENT OF MATERIAL
## TERMS OF DIP LOAN AND CASH COLLATERAL

22.     In accordance with Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B), below is a concise statement of the relief requested with respect to the proposed financing:[1]

---

[1]     This statement is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Loan Documents or the Interim or Final Orders, the provisions of the DIP Loan Documents or the Interim or Final Orders, as applicable, shall control.

7

4904-2935-4901, v. 7

| Bankruptcy Code/Rules | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Goodbear Property LLC |
| **Guarantor**<br>Bankruptcy Rule 4001(c)(1)(B) | Jaclyn Iarossi |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | First National Bank of Scotia |
| **DIP Facility** | Senior secured superpriority revolving line of credit in the principal amount of $250,000. |
| **Maturity / Termination**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | Due and payable in full on the earliest of the following dates (the "DIP Termination Date"):<br><br>a.   November 30, 2026;<br>b.   The appointment of a chapter 11 trustee for either or both of the Borrowers, or the conversion of a Borrower's bankruptcy case from chapter 11 to chapter 7;<br>c.   The consummation of any sale or other disposition of all or substantially all of the assets of either or both of the Borrowers pursuant to section 363 of the Bankruptcy Code (a "Sale"); and<br>d.   The date of the acceleration of the DIP Loan as a result of any uncured Event of Default. |
| **Repayment** | All outstanding DIP Obligations shall immediately become due and payable in full on the DIP Termination Date. |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | a.   DIP Loan – 6.95% per annum based upon a 360-day year.<br>b.   Default Interest – 10.95% per annum based upon a 360-day year. |
| **Use of Borrowed Funds and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B), Bankruptcy Rule 4001(c)(1)(B) | Working capital to continue their business operations in the ordinary course and general corporate purposes; professional and US Trustee fees; chapter 11 administrative expenses.<br>The Debtors seek to use the Cash Collateral to continue their business operations in the ordinary course and the budget attached as Exhibit 1 |
| **Entities with an asserted interest in Collateral**<br>Bankruptcy Rule 4001(b)(1)(B) | FNBS; Warren County; ACE Endico; SBA |
| **Amount of Cash Collateral Sought**<br>Bankruptcy Rule 4001(b)(1)(B) | The Debtors seek to use approximately $40,000 in the next 14 days and $80,000 in total, during the next 30 days. |

8

| Prepayments | Required with 100% of (i) the net cash proceeds from sale or disposition of any assets, and (ii) insurance proceeds received for any Borrower liability or casualty event. |
|---|---|
| **Conditions Precedent to Advances** | a. The DIP Lender shall have received duly executed counterparts from each party of all DIP Loan Documents; <br> b. The Petition Date shall have occurred, and the Borrowers shall be debtors in possession; <br> c. Entry and effectiveness of the DIP Approval Order; <br> d. Approval of the Budget; <br> e. Compliance with the Budget and the DIP Lender shall have received all required updates; <br> f. No trustee or examiner shall have been appointed and no motion shall be pending for similar relief; <br> g. The DIP Lender shall be satisfied in its sole discretion with cash management arrangements of the Borrower; <br> h. The representations and warranties of the Borrower shall be true and correct as of the dates made; <br> i. No default or Event of Default exists; and <br> j. The DIP Lender shall have received certificates of insurance naming the DIP Lender as loss payee and additional insured with respect to all property and casualty and liability insurance policies of the Borrower. |
| **Affirmative Covenants** | The DIP Loan Documents will contain the following affirmative covenants: <br> • Delivery of financial statements. <br> • Delivery of updates to Budget and variance reports. <br> • Notification of Event of Default. <br> • Discharge post-petition taxes. <br> • Maintain legal existence. <br> • Maintain required permits, licenses and franchises to conduct business. <br> • Maintain material properties and equipment in good working order. <br> • Maintain insurance. <br> • Comply in material respects with all requirements of law. <br> • Keep books and records in accordance with GAAP. <br> • Permit the DIP Lender to visit and inspect any of Borrower's properties and examine the Borrower's'\ corporate, financial and operating records during normal business hours on reasonable advance notice. <br> • Use the DIP LOC only in accordance with the Budget and the Carve-Out. <br> • Use reasonable best efforts to enter into and obtain approval of the DIP facility. |
| **Negative Covenants** | The DIP Loan Documents will contain the following negative covenants: <br> • Limitations on indebtedness. <br> • Limitations on liens. <br> • Limitations on sale transactions. <br> • Limitations on investments, loans and advances. |
| **Budget** <br> Bankruptcy Rule 4001(c)(1)(B) | a. Borrower shall provide a weekly Budget and weekly 13-week rolling projections. <br> b. Borrower shall deliver periodic variance reports comparing (x) total receipts for such period to total receipts for such period as set forth in the Budget on a cumulative rolling basis, and (y) total disbursements for such period to total disbursements for such period as set forth in the Budget on a cumulative rolling basis. <br> c. Line item variance of a maximum of 10% and a total variance of no more than 5%. |

9

| | |
|---|---|
| **Collateral and Priority**<br>11 U.S.C. § 364(d)(1),<br>Fed. R. Bankr. P.<br>4001(c)(1)(B)(i) | All owned or hereafter acquired assets and property of the Debtors (including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property), and the proceeds thereof, and all claims and causes of action (including claims or causes of action under section 549 of the Bankruptcy Code), and commercial tort claims (including but not limited to tort claims arising out or related to any injury or damage to or destruction of any of Debtors' property, facilities, intellectual property and/or technology); *provided, however*, that Collateral excludes any avoidance actions under sections 502(d), 544, 545, 547, 548, 550 or 553 of the Bankruptcy Code or any other avoidance actions or provisions (other than section 549) of the Bankruptcy Code or applicable non-bankruptcy law (the "Collateral").<br><br>Priority – the DIP Lender shall be granted:<br><br>a.   Priming Liens – perfected first priority priming security interest and lien ("Priming Liens")<br><br>b.   First Priority Liens – perfected first priority security interest and lien on the Collateral to the extent such Collateral is not subject to valid, perfected and non-avoidable liens ("First Priority Liens"); and<br><br>c.   Superpriority Claims. Superpriority administrative expense claims in the Debtors' chapter 11 cases. |
| **Adequate Protection**<br>11 U.S.C. § 361,<br>Bankruptcy Rules<br>4001(b)(l)(B)(iv),<br>4001(c)(1)(B)(ii) | a.   Rollover and Replacement Liens. Effective and perfected on the date of this Interim Order and without further action, FNBS is granted a replacement and rollover security interest in and valid, binding, enforceable and perfected liens on all of the Debtors' Post-petition Collateral (the "Rollover Liens") subject only to the Carve-Out (defined below). The term "Post-petition Collateral" means all of the Debtors' assets, including, without limitation, all of the Debtors' cash, accounts receivable, inventory, equipment, fixtures, general intangibles, documents, instruments, chattel paper, deposit accounts, letter-of-credit rights, investment property, and books and records relating to any assets of the Debtors and all proceeds (including, but not limited to, insurance proceeds and refunds of worker's compensation insurance deposits) and products of the foregoing, whether in existence on the Petition Date or thereafter created, acquired or arising and wherever located, including a first lien on all recoveries of tax payments or refunds, recovered in the Debtors' cases, provided, however, that the Post-petition Collateral shall not include claims of the Debtors, if any, pursuant to chapter 5 of the Bankruptcy Code ("Avoidance Claims") or any monies or other property recovered in connection with the successful prosecution or settlement of Avoidance Claims.<br><br>b.   Superpriority Claims. To the extent that the pledges, liens and security interests granted to FNBS herein are inadequate, and subject to the Carve-Out, FNBS claims shall be entitled to administrative priority pursuant to 11 U.S.C. §§ 503(b) and 507(b), with priority over any and all claims against the Debtors of any kind whatsoever, and shall continue notwithstanding the appointment of a Chapter 11 trustee or, to the extent provided by the Bankruptcy Code, the conversion of this case to a case under Chapter 7 of the Bankruptcy Code.<br><br>c.   Adequate Protection Payments. To the extent of cash available in excess of cash needed to fund operations in accordance with the Debtors' Budget, the Debtors shall make or cause to be made monthly adequate protection payments to FNBS in the form of continued monthly payments to FNBS on the FNBS Pre-petition Mortgage Loan, which payments shall be made in the ordinary course and pursuant to the terms of the Atlas Loan Documents. |

10

| | |
|---|---|
| **Carve-Out**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The Rollover Liens are subject to a "Carve-Out", which means an amount sufficient to satisfy any quarterly fees owed to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6), plus the amount of $75,500 to pay any Court approved fees and expenses of professionals retained by the Debtors, to the extent incurred on or before 20 days after a declared Event of Default hereunder.  For purposes of clarity, this Carve-Out is the total to be granted in the aggregate between Debtors' two cases.  The Carve-Out shall survive conversion of the cases to Chapter 7.  If the cases convert, there will be a $7,500 carve-out for the chapter 7 trustee. |
| **Reporting Information**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The DIP Loan includes standard and customary conditions that require the Debtors to provide periodic reports to the DIP Lender regarding the Budget, the status of these chapter 11 cases, and certain other matters. The failure of the Debtors to comply with such reporting obligations will cause an Event of Default that may permit the DIP Lender to exercise remedies against the Debtors, including terminating the DIP LOC. |
| **Events of Default** | An Event of Default shall exist upon the occurrence of any of the following specified events or conditions (each an "Event of Default"):<br><br>a.  Any obligations are not paid when due;<br>b.  An event of default occurs under another agreement;<br>c.  Any representation or warranty is found to be materially incorrect when made;<br>d.  Conversion or dismissal of a Borrower's case;<br>e.  Appointment of a Chapter 11 trustee or an examiner with expanded powers;<br>f.  Any other super-priority administrative expense claim or any lien is granted which is *pari passu* with or senior to those of the DIP Lender;<br>g.  Sale of assets without the DIP Lender's approval. |
| **Indemnification** | Borrower shall indemnify and hold the DIP Lender harmless from and against any and all present and future claims, liabilities and damages arising in connection with the DIP LOC or the Collateral, except for any of the foregoing arising out of the gross negligence or the willful misconduct of the DIP Lender and all costs and expenses (including reasonable attorneys' fees) incurred by the DIP Lender. |

## BASIS FOR RELIEF

I.    **The Debtors Should be Authorized to Obtain Postpetition Financing Through the DIP Loan Documents.**

A.    **Entry into the DIP Loan Documents is an Exercise of the Debtors' Sound Business Judgment.**

22.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See In re Barbara K. Enters., Inc.*, No. 08-11474, 2008

11

Bankr. LEXIS 1917, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

23.    Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP LOC, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, No. 09-13125, 2009 Bankr. LEXIS 1700 (Bankr. S.D.N.Y. July 6, 2009), the Bankruptcy Court for the Southern District of New York held:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

*Id.* at *5.

12

4904-2935-4901, v. 7

24.     This rationale applies with full force here.  The DIP loan represents a resolution between the Debtors and their prepetition secured lender.  Following extensive negotiations, the Debtors were able to come to a resolution not only on economic terms, but also achieved a resolution regarding case management and controls that provide the Debtors with flexibility to ensure they maintain a value-maximizing path to emergence.  The Debtors' access to the DIP Loan, therefore, will enable them to preserve their value as a going concern by providing crucial liquidity under terms that allow for the prospect of confirming a plan.

**B.      The Debtors Should Be Authorized to Grant Liens
and Superpriority Claims.**

25.     The Debtors propose to obtain financing under the DIP LOC by providing security interests and liens as set forth in the DIP Loan Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the Interim Order), which includes substantially all of the Debtors' assets.  FNBS will have similar cross-collateralized first priority liens on the DIP Collateral as it does on the Prepetition Collateral.

26.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 440–41 (Bankr. S.D.N.Y. 2010) (noting that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

13

4904-2935-4901, v. 7

a.  the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.  the credit transaction is necessary to preserve the assets of the estate; and

c.  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders. *See In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also Norris Square Civic Assoc. v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

27.  As described above and as set forth in the Iarossi Declaration, due to the Debtors' level of existing secured debt obligations and the intertwined nature of the capital structure, third-party lenders were unwilling to provide postpetition financing on an unsecured basis or otherwise junior to FNBS. *See* Iarossi Decl. ¶ 12. Moreover, all of the Debtors' existing assets including cash collateral are encumbered. *Id.* Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or need to be provided by, FNBS. There are no other readily available options. Thus, the Debtors determined that the DIP Loan provided the best opportunity available under the circumstances to fund these chapter 11 cases. *Id.* ¶ 13.

28.  To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (super-priority administrative expenses authorized where debtor could not obtain credit as an

14

administrative expense).  When few lenders are likely to be able and/or willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

29.    Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP LOC if either (a) the Secured Lenders have consented or (b) the Secured Lenders' interests in collateral are adequately protected.

30.    Here, as set forth more fully in the Interim Order, the Debtors propose to provide a variety of adequate protection to protect the interests of the Secured Lenders. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

15

31.     Absent the DIP Loan, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Loan, as set forth in the DIP Loan Documents, are reasonable and adequate, given the circumstances.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

**II.       The Debtors Should be Authorized to Use
Cash Collateral on an Interim Basis**

32.     Bankruptcy Rule 4001(b)(2) provides that a final hearing on a motion for the authority to use cash collateral may not be commenced earlier than 14 days after the service of the motion. Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

33.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that this Court (a) conduct a hearing (the "Interim Hearing") to consider the entry of the Interim Order authorizing the Debtors, on an interim basis, to use approximately $40,000 of cash to avoid immediate and irreparable harm to their estate pending the Final Hearing. and (b) approximately 14 days thereafter, schedule the Final Hearing to consider entry of the Final Order authorizing the Debtors to use Cash Collateral on a final basis.  During the 30-day period following the hearing date of this Motion the Debtors expect to use approximately $80,000 of Cash Collateral.  The balance of expenses to be paid will come from advances under the DIP Loan.  The Debtors believes this amount is adequate to cover their expenses during that period.

16

34.   Interim relief is necessary to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest in the Debtors' chapter 11 cases.

### A.   Adequate Protection for the Use of Cash Collateral

#### i.   *Adequate Protection to FNBS*

35.   Pursuant to 11 U.S.C. §§ 361 and 363(c)(2), FNBS is granted adequate protection of its interests in the Prepetition Collateral in an amount equal to the aggregate diminution in the value of its interests in the Prepetition Collateral, including, without limitation, any such diminution resulting from the Debtors' use of the Cash Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code or otherwise as set forth herein (collectively, the "Adequate Protection") as follows:

a.   Rollover and Replacement Liens.  Effective and perfected on the date of this Interim Order and without further action, FNBS is granted a replacement and rollover security interest in and valid, binding, enforceable and perfected liens on all of the Debtors' Post-petition Collateral (the "Rollover Liens") subject only to the Carve-Out (defined below).  The term "Post-petition Collateral" means all of the Debtors' assets, including, without limitation, all of the Debtors' cash, accounts receivable, inventory, equipment, fixtures, general intangibles, documents, instruments, chattel paper, deposit accounts, letter-of-credit rights, investment property, and books and records relating to any assets of the Debtors and all proceeds (including, but not limited to, insurance proceeds and refunds of worker's compensation insurance deposits) and products of the foregoing, whether in existence on the Petition Date or thereafter created, acquired or arising and wherever located, including a first lien on all recoveries of tax payments or refunds, recovered in the Debtors' cases, provided, however, that the Post-petition Collateral shall not include claims of the Debtors, if any, pursuant to chapter 5 of the Bankruptcy Code

4904-2935-4901, v. 7

("Avoidance Claims") or any monies or other property recovered in connection with the successful prosecution or settlement of Avoidance Claims.

        b.      Superpriority Claims. To the extent that the pledges, liens and security interests granted to FNBS are inadequate, and subject to the Carve-Out, FNBS claims shall be entitled to administrative priority pursuant to 11 U.S.C. §§ 503(b) and 507(b), with priority over any and all claims against the Debtors of any kind whatsoever, and shall continue notwithstanding the appointment of a chapter 11 trustee or, to the extent provided by the Bankruptcy Code, the conversion of this case to a case under chapter 7 of the Bankruptcy Code.

        c.      Adequate Protection Payments. To the extent of cash available in excess of cash needed to fund operations in accordance with the Debtors' Budget, the Debtors shall make or cause to be made monthly adequate protection payments to FNBS in the form of continued monthly payments to FNBS on the FNBS Pre-petition Mortgage Loan, which shall be made in the ordinary course and pursuant to the terms of the Atlas Loan Documents.

        d.      Reporting. The Debtors will provide FNBS with weekly budgets, 13-week rolling projections and other reports requested by the bank.

### ii.      *Adequate Protection to Warren County*

36.      As adequate protection for Goodbear's use of its Collateral, Warren County will receive (i) rollover liens (subject to the Carve-Out) on Atlas' post-petition acquired assets, to the same extent, validity and priority as held by them on the Petition Date (the "Junior Rollover Liens"), but junior in all respects subject to FNBS's Rollover Liens.

### iii.      *Adequate Protection to Other Secured Creditros*

37.      ACE Endico and the SBA have filed UCC-1 financing statements against Goodbear. Pursuant to section 506(a)(1) of the Bankruptcy Code, the interest of these creditors

18

in the collateral is zero, because senior creditors are undersecured, and the Debtors submit, therefore, that no adequate protection is required.

## CONCLUSION

38. The Debtors require post-petition financing and the use of cash collateral to continue to manage their property and operate their businesses. The combination of the two available sources of funds – cash flow and cash collateral – will enable them to preserve and enhance the value of their assets and business for the benefit of all parties in interest.

## NOTICE

39. Following entry of the Interim Order, in accordance with Bankruptcy Rules 4001(b)(3) and 4001(c)(3) and the Local Rules, the Debtor will provide adequate notice of the Motion and the Final Hearing to: (a) the United States Trustee for the Northern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to FNBS; (d) New York State; (e) Warren County; and (e) the United States Attorney for the Northern District of New York. Notice shall be given by email or by mailing a copy of the Interim Order and the Motion. The Debtors submit that no other or further notice need be provided.

40. No previous application for the relief requested has been made.

**[concluded on next page]**

19

4904-2935-4901, v. 7

**WHEREFORE**, the Debtors respectfully requests that this Court: (i) enter the Interim Order in the form attached as Exhibit 2; (ii) schedule the Final Hearing; (iii) enter, after the Final Hearing, the Final Order; and (iv) grant them such other and further relief as to this Court deems just and proper.

Dated: New York, New York
      May 1, 2026

R3M LAW, LLP
*Proposed Counsel for Atlas Land Holdings, LLC
and Goodbear Property LLC
Debtors and Debtors in Possession*
By:

/s/ Howard P. Magaliff
HOWARD P. MAGALIFF
437 Madison Avenue, 24th Floor
New York, NY 10022
646.453.7851
*hmagaliff@r3mlaw.com*

20

4904-2935-4901, v. 7

## EXHIBIT 1

**30-Day Budget**

# Friends Lake Inn Operating Budget
*May 1st - May 30th 2026*

| Section | Category | Actuals | 15-Day Budget | 30-Day Budget | Var 15-Day $ | Var 15-Day % | Var 30-Day $ | Var 30-Day % | Assumptions |
|---|---|---|---|---|---|---|---|---|---|
| | | *May 2025* | | | | | | | |
| **REVENUE** | | | | | | | | | |
| | Restaurant Sales | $19,533 | $8,301 | $16,603 | -$11,231 | -57.50% | -$2,930 | -15.00% | 15% decrease; 15-day = 50% |
| | Event/Hotel Sales | $74,510 | $31,667 | $63,333 | -$42,843 | -57.50% | -$11,176 | -15.00% | 15% decrease; 15-day = 50% |
| | **Total Revenue** | **$94,043** | **$39,968** | **$79,936** | **-$54,075** | **-57.50%** | **-$14,106** | **-15.00%** | |
| **COGS** | | | | | | | | | |
| | Alcohol COGS | $5,112 | $2,798 | $5,596 | -$2,314 | -45.27% | $484 | 9.47% | 7%          Sales |
| | Food COGS | $2,225 | $3,597 | $7,194 | $1,372 | 61.67% | $4,969 | 223.33% | 9%          Sales |
| | Beverage COGS | $1,202 | $250 | $500 | -$952 | -79.20% | -$702 | -58.40% | Avg. 4 month est |
| | **Total COGS** | **$8,539** | **$6,645** | **$13,290** | **-$1,894** | **-22.18%** | **$4,751** | **55.64%** | |
| **PAYROLL** | | | | | | | | | |
| | Salaries & Wages | $48,795 | $26,114 | $48,795 | -$22,681 | -46.48% | $0 | 0.00% | Weekly cycle mapping |
| | Payroll Taxes | $18,502 | $9,671 | $18,502 | -$8,831 | -47.73% | $0 | 0.00% | Weekly cycle mapping |
| | **Total Payroll** | **$67,565** | **$35,785** | **$67,298** | **-$31,780** | **-47.04%** | **-$267** | **-0.40%** | |
| **OPERATING EXPENSES** | | | | | | | | | |
| | Accounting | | $4,400 | $4,400 | | | | | Past due accountant |
| | Bank Fees | $1,761 | $500 | $999 | -$1,261 | -71.62% | -$761 | -43.25% | 1.25%          Sales |
| | Equipment Rental | $200 | $700 | $700 | | | | | Dishwasher (500 delivery fee) |
| | Insurance | $3,820 | $1,910 | $4,000 | -$1,910 | -50.00% | $180 | 4.72% | No change |
| | Laundry Services | | | $1,750 | | | | | |
| | Management Co. | $0 | $4,400 | $13,700 | $4,400 | | | | Flat monthly fee Plus GM fee (3500 travel & $900/week salary for 3 weeks) |
| | Marketing | $995 | $899 | $10,800 | -$96 | -9.62% | $9,805 | 985.73% | ~$800 additional + 9k for wedding wire |
| | Merchant Fees | $88 | $600 | $1,399 | $512 | 584.54% | $1,311 | 1496.12% | 1.75%          sales |
| | Miscellaneous | $1,200 | $600 | $1,200 | -$600 | -50.00% | $0 | 0.00% | No change |
| | Repairs & maintenance | | | $2,250 | | | | | |
| | Software & Apps | $1,295 | $648 | $1,250 | -$648 | -50.00% | -$45 | -3.48% | No change |
| | Supplies | $1,131 | $622 | $1,350 | -$509 | -45.00% | $219 | 19.31% | +10% |
| | Utilities | | $4,000 | $6,569 | | | | | Buckman, Apr.25 nat grid, casella, spectrum, Water testing |
| | **Total OpEx** | **$11,540** | **$19,278** | **$50,367** | **$7,739** | **67.06%** | **$38,827** | **336.47%** | |
| **EVENT VENDORS** | | | | | | | | | |
| | Event Vendors | $6,200 | $3,100 | $4,750 | -$3,100 | -50.00% | -$1,450 | -23.39% | Seasonal swings |
| **TAXES** | | | | | | | | | |
| | Occupancy Tax | | $1,267 | $2,533 | | | | 4.00% | 4% of Event/Hotel Sales |
| | Sales Tax | | $2,798 | $5,596 | | | | 7.00% | 7% of Total Revenue |
| | **Total Taxes** | | **$4,064** | **$8,129** | | | | | |
| **CAPEX** | | | | | | | | | |
| | CapEx | | $3,750 | $7,500 | | | | | Flat allocation |
| **BANKRUPTCY EXPENSES** | | | | | | | | | |
| | Legal Fees | | | | | | | | |
| | Bank Payments | | | | | | | | |
| | U.S. Trustee fees | | | | | | | | paid Qtrly - M1 |
| | **Total Bankruptcy Fees** | | **$0** | **$0** | | | | | |
| **NET OPERATING INCOME** | | | | | | | | | |
| | Total Revenue | | $39,968 | $79,936 | | | | | |
| | Total Expenses | | $72,623 | $151,334 | | | | | |
| | **Net Operating Income** | | **-$32,655** | **-$71,397** | | | | | |

## EXHIBIT 2

**Proposed Interim Order**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re:                                                    :
                                                          :        Chapter 11
ATLAS LAND HOLDINGS, LLC,                                  :        Case No. 26-10493-pgr
                                                          :
                              Debtor.                     :
                                                          :
EIN: 88-2163998                                           :
---------------------------------------------------------------x

In re:                                                    :
                                                          :        Chapter 11
GOODBEAR PROPERTY LLC,                                     :        Case No. 26-10494-pgr
                                                          :
                              Debtor.                     :
                                                          :
EIN: 83-3089373                                           :
---------------------------------------------------------------x

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS' USE OF
CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION
PURSUANT TO §§ 105, 361 AND 363 OF THE BANKRUPTCY CODE,
(C) AUTHORIZING POSTPETITION FINANCING PURSUANT TO § 364
OF THE BANKRUPTCY CODE, AND GRANTING (D) RELATED RELIEF**

Upon consideration of the motion, dated May 1, 2026 (ECF doc. __, the "Motion") of At-

las Land Holdings, LLC ("Atlas") and Goodbear Property LLC ("Goodbear"), the debtors and

debtors in possession in the above-captioned cases (the "Debtors"), by their attorneys R3M Law, LLP, for entry of interim and final orders  (a) authorizing the Debtors' use of Cash Collateral (defined below), (b) granting adequate protection pursuant to §§ 105, 361 and 363 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code") with respect to the diminution in value of the interests of the Secured Parties (as defined *infra.*) as a result of the use of the Prepetition Collateral, including Cash Collateral, (c) authorizing post-petition financing pursuant to Bankruptcy Code § 364, (d) scheduling a final hearing (the "Final Hearing") pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (e) pending the Final Hearing, entering an interim order on the terms and conditions herein (the "Interim Order"), and (f) granting related relief; and the interim hearing to consider the interim relief requested in the Motion having been held before the Court on May __, 2026 (the "Interim Hearing"); and good and sufficient notice of the Motion and the Interim Hearing on the Motion having been given; and the Court having considered the Motion, the First Day Declaration (as defined in the Motion), and the evidence submitted or adduced and the arguments of counsel made at the Interim Hearing; and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable, in the best interests of the Debtors, their estates, their creditors and all other parties-in-interest in the Chapter 11 Cases, and essential to maximize the value of the Debtors' assets; and after due deliberation and consideration, and for good and sufficient cause appearing therefor,

**THE COURT FINDS AND CONCLUDES THAT:[1]**

A.        On May 1, 2026 (the "Petition Date"), each the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of New York (the "Court").

B.        The Debtors remain in possession of their assets and continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or creditors' committee has been appointed in either case.

C.        The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and rule-based predicates for the relief requested are sections 105, 361, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014.

D.        After consultation with its attorneys and financial advisors, but without prejudice to the rights of parties in interest as set forth in paragraph 11 below, the Debtors admit, stipulate, acknowledge and agree as follows (collectively, paragraph D shall be called the "Debtors' Stipulations"):

1.        Debtor Atlas is the borrower on a commercial mortgage loan with First National Bank of Scotia ("FNBS"), all as more specifically described in the Motion and the loan documents as set forth on **Schedule A** (collectively, the "Atlas Loan Documents").

2.        Debtor Goodbear is the borrower on a commercial line of credit loan with FNBS, all as more specifically described in the Motion and the loan

---

[1]    Pursuant to Bankruptcy Rule 7052, any findings of fact contained herein may be treated as conclusions of law as if set forth below, and vice versa

3

4912-4454-2093, v. 7

documents as set forth on **Schedule A** (collectively, the "Goodbear Loan Documents" and together with the Atlas Loan Documents and the Overdraft Repayment Demand Note set forth below, the "Prepetition Loan Documents").

3. Debtor Goodbear is the borrower on Overdraft Repayment Demand Note set forth on **Schedule A**.

4. Atlas owns the real property located at 963 Friends Lake Road, Chestertown, New York (the "Property").

5. Goodbear manages the hotel, restaurant and catering business located on the Property known as Friends' Lake Inn.  Goodbear is in need of access to a debtor in possession line of credit as described below.

6. As of the Petition Date, FNBS asserts and Atlas acknowledges that Atlas is indebted to FNBS in the amount of $4,867,746.38 plus interest and fees under the Atlas Loan Documents ("FNBS Atlas Debt").

7. As of the Petition Date, FNBS asserts and Goodbear acknowledges that Goodbear is indebted to FNBS in the amount of $107,855.47 plus interest and fees under the Goodbear Loan Documents and $232,182.75 on the Overdraft Repayment Demand Note (collectively, the "FNBS Goodbear Debt").

8. Performance of the Debtors' prepetition obligations with FNBS are secured by, among other things, a first priority blanket lien on all of Goodbear's personal property and assets and a first priority mortgage lien on Atlas' real property and personal property (the "Prepetition Collateral").

4

4912-4454-2093, v. 7

9. Prepetition, Debtor Goodbear's line of credit with FNBS, as described on Schedule A (the "FNBS Line of Credit"), operated as continued financing whereby the FNBS Line of Credit was linked to an access account maintained at FNBS and when a check was drawn on that account, the FNBS Line of Credit automatically advanced and transferred funds to cover the check. Goodbear seeks to have access to a new post-petition Debtor in Possession Line of Credit under the terms and conditions set forth below (the "FNBS DIP LOC").

E. An immediate need exists for the Debtors to use cash collateral as defined in section 363(a) of the Bankruptcy Code, including any and all prepetition and post-petition proceeds of the Prepetition Collateral (the "Cash Collateral").

F. Good cause has been shown for the immediate entry and effectiveness of this Interim Order pursuant to Bankruptcy Rule 4001(b). The Debtors have an immediate need to use Cash Collateral to, among other things, fund the orderly continuation of their businesses, maintain the confidence of their customers and vendors, pay operating expenses, preserve going-concern value and pay the costs of administering the Chapter 11 Cases, consistent with the Budget (as defined *infra.*).

G. FNBS is prepared to consent to the Debtors' interim use of Cash Collateral only if the Debtors agree, and the Court orders in this Interim Order, that the Debtors provide Adequate Protection as set forth herein.

H. As Adequate Protection for the Debtor's use of Cash Collateral, FNBS will receive (i) rollover liens (subject to the Carve-Out), (ii) the Debtors shall provide FNBS with certain reporting as set forth herein; and (iii) the Debtors will retain the professionals identified herein to assist the Debtors in managing their businesses and evaluating them for sale. The

5

Adequate Protection is (i) reasonable and sufficient to protect the interests of FNBS, (ii) consistent with and authorized by the Bankruptcy Code, and (iii) necessary to obtain the consent of FNBS. The terms of this Interim Order were the subject of good faith and arm's length negotiations among the Debtors and FNBS.

I. Findings Regarding of FNBS DIP LOC:

1. Goodbear has an immediate need to use the FNBS DIP LOC to permit, among other things, the orderly continuation of the operation of its business, to maintain business relationships with vendors, suppliers and customers, to make payroll, and to satisfy other working capital and operational needs. The access of Goodbear to the FNBS DIP LOC is vital to the preservation and maintenance of both Debtors' ability to fund operations and to reorganize.

2. FNBS is willing to extend the FNBS DIP LOC on the terms and conditions set forth in the Debtor in Possession Loan Agreement (the "DIP Agreement") and documents executed and delivered in accordance therewith which are the Debtor in Possession Revolving Line of Credit Note (Secured) in the amount of $250,000.00 (the "DIP LOC Note") and the Commercial Guaranty of Jaclyn M. Iarossi (the "DIP Guaranty") (collectively, the "DIP Loan Documents") which are all attached as Exhibit 1.

3. The Debtors are unable to obtain a post-petition credit facility on more favorable terms from sources other than FNBS under the FNBS DIP LOC and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections

6

364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting to FNBS the DIP Liens and the Superpriority Claims (as defined below) upon the terms and conditions set forth in this Interim Order and as provided for the in the DIP Agreement.

4.  The terms of the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

5.  The DIP Loan Documents were negotiated in good faith and at arm's length between Goodbear and FNBS, and all of Goodbear's obligations and indebtedness arising under, in respect of or in connection with the DIP Loan Documents shall be deemed to have been extended by FNBS in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

6.  Goodbear has requested approval of its use of the FNBS DIP LOC pursuant to Bankruptcy Rule 4001(c)(2).  Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Use of the FNBS DIP LOC is therefore in the best interest of the Debtors' estates.

J.  Notice of the Motion and relief requested by the Motion was served by the Debtors on (a) the United States Trustee for the Northern District of New York (the "U.S. Trustee");

7

(b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d) (the "Top 20 Creditors"); (c) counsel to FNBS; (d) Warren County, and (e) the United States Attorney for the Northern District of New York.  Notice of the Interim Hearing was given in accordance with the Court's scheduling order dated May __, 2026.  The foregoing notice was, in the Debtors' belief, the best available under the circumstances.

**THEREFORE, BASED UPON THE STIPULATED TERMS SET FORTH HEREIN AND THE FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS OR-DERED, ADJUDGED AND DECREED THAT:**

1.      **Incorporation.**  All of the findings of fact and Debtors' Stipulations set forth above are incorporated by reference in this Interim Order.

2.      **Motion Granted.**  The Motion is granted on the terms and conditions set forth in this Interim Order.  Any objections or responses to the relief requested in the Motion that have not been previously withdrawn, waived, or settled, and all reservations of rights included in such objections and responses, are hereby overruled on the merits and denied with prejudice or, to the extent applicable, deferred until the hearing on any successive or final order.  The rights of all parties to object to entry of any successive or final order are reserved.

3.      **Use of Cash Collateral**.  The Debtors are authorized, pursuant to 11 U.S.C. § 363I(2)(B), to use of Cash Collateral through and including May 31, 2026 in accordance with the budget attached as **Exhibit 2** (the "Budget"), which was provided to FNBS for review and approval.  The Debtors shall not, without the prior written consent of FNBS, use Cash Collateral in an amount that exceeds any particular authorized line item by more than 10%, or in excess of 5% of the total Budget (the "Permitted Variance").  Following the term of this initial budget pe-riod for the purpose of this Initial Order, the Debtors shall be required to provide a weekly Budget to FNBS for FNBS's review and approval.

8

4912-4454-2093, v. 7

4.       **FNBS Loan Documents**.  Subject to the rights of any creditor, party in interest or creditors' committee to assert a Lien Challenge as set forth in paragraph 11 below, the Debtors hereby ratify and confirm the Prepetition Loan Documents and all of the terms and provisions therein, and they shall be deemed to be in effect and constitute continuing obligations of the Debtors without offset, claim, waiver, or defense with the same force and effect as if the Pre-petition Loan Documents had been re-executed by the Debtors after the Petition Date but shall not constitute a post-petition loan, except with regard to advances, if any, under the FNBS DIP LOC. The Debtors shall not assert any claim, defense, plea, counterclaim or set-off against any of the amounts due or to become due to FNBS under the DIP Loan Documents or the FNBS DIP LOC. The foregoing provisions shall not bind a creditors' committee or Chapter 7 trustee in this case, and all rights of FNBS are preserved in that regard.

5.       **Adequate Protection to FNBS**. As adequate protection for the Debtors' use of Cash Collateral, FNBS is granted, pursuant to 11 U.S.C. §§ 361 and 363I(2), adequate protection of its interests in the Prepetition Collateral in an amount equal to the aggregate diminution in the value of its interests in the Prepetition Collateral, including, without limitation, any such diminution resulting from the Debtors' use of the Cash Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code or otherwise as set forth herein (collectively, the "Adequate Protection") as follows:

a.       Rollover and Replacement Liens.  Effective and perfected on the date of this Interim Order and without further action, FNBS is granted a replacement and rollover security interest in and valid, binding, enforceable and perfected liens on all of the Debtors' Post-petition Collateral (the "Rollover Liens") subject only to the Carve-Out (defined below).  The term "Post-petition Collateral" means all of the Debtors' assets, including, without limitation, all of the Debtors' cash, accounts receivable, inventory, equipment, fixtures, general intangibles,

9

documents, instruments, chattel paper, deposit accounts, letter-of-credit rights, investment prop-

erty, and books and records relating to any assets of the Debtors and all proceeds (including, but

not limited to, insurance proceeds and refunds of worker's compensation insurance deposits) and

products of the foregoing, whether in existence on the Petition Date or thereafter created, ac-

quired or arising and wherever located, including a first lien on all recoveries of tax payments or

refunds, recovered in the Debtors' cases, provided, however, that the Post-petition Collateral

shall not include claims of the Debtors, if any, pursuant to chapter 5 of the Bankruptcy Code

("Avoidance Claims") or any monies or other property recovered in connection with the success-

ful prosecution or settlement of Avoidance Claims.

b.      Superpriority Claims.  To the extent that the pledges, liens and security in-

terests granted to FNBS herein are inadequate, and subject to the Carve-Out, FNBS claims shall

be entitled to administrative priority pursuant to 11 U.S.C. §§ 503(b) and 507(b), with priority

over any and all claims against the Debtors of any kind whatsoever, and shall continue notwith-

standing the appointment of a Chapter 11 trustee or, to the extent provided by the Bankruptcy

Code, the conversion of this case to a case under Chapter 7 of the Bankruptcy Code.

c.      Adequate Protection Payments.  To the extent of cash available in excess

of cash needed to fund operations in accordance with the Debtors' Budget, the Debtors shall

make or cause to be made monthly adequate protection payments to FNBS in the form of contin-

ued monthly payments to FNBS on the Atlas Loan as set forth on Schedule A, which payments

shall be made in the ordinary course and pursuant to the terms of the Atlas Loan Documents.

d.      Reporting. The Debtors shall deliver to FNBS:

i.      a weekly budget, every Thursday;

ii.     a 13-week cash flow projection, updated every Thursday;

iii.    a weekly cash Budget analysis, delivered on or before Thursday of
        the immediately following week for each week during the Cash

10

Collateral period showing actual performance versus Budget, together with a report of the initial and ending cash position of the Debtors for such week, the collections during such week, the amounts and aging of accounts receivable, and accounts payable;

iv.  beginning on _____, 2026 and then on or before the thirtieth (30th) day of each month thereafter, profit and loss statements for each of (i) the Debtors' fiscal year to date and (ii) the period following the Petition Date, in each case broken down on a monthly basis; and

v.  beginning on June 20, 2026 and then on or before the twentieth (20th) day of each month thereafter, the monthly operating report that is required to be filed during that month pursuant to the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees promulgated by the Office of the United States Trustee for Region 2.

e.  <u>Continued Operation of Debtors' Businesses</u>.  FNBS will additionally be protected as a result of the continued operation of the Debtors' businesses as provided below.

f.  <u>Hiring of Manager</u>.  The Debtors recognize that professional management of their businesses is needed as to efficiently run operations.  Therefore, as a condition of their use of Cash Collateral, the Debtors shall promptly make application to the Court to hire Prestige Hospitality as manager.

g.  <u>Undertake Good Faith Efforts to Sell Assets</u>.  The Debtors also wish to sell their property, business and assets as a going concern, and agree to promptly make application to the Court to retain a business and / or real estate broker, or other professional, the selection of which shall be subject to FNBS's approval, such approval not to be unreasonably withheld.

h.  <u>Additional Adequate Protection</u>.  FNBS may seek any additional protection as it may require with respect to the Prepetition Collateral, including the Cash Collateral.  FNBS shall be entitled to such other adequate protection as reasonably agreed upon by FNB and the Debtors and approved by this Court, or otherwise granted by this Court.

11

6.    **Adequate Protection to Junior Tax Lien Creditors**.  As adequate protection for Goodbear's use of their Collateral, New York State and Warren County will receive (i) rollover liens (subject to the Carve-Out) on Goodbear's post-petition acquired assets, to the same extent, validity and priority as held by them on the Petition Date (the Junior Rollover Liens"), but junior in all respects subject to FNBS's Rollover Liens.

7.    **Post-petition Lien Perfection**.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Rollover Liens and Junior Rollover Liens without the necessity of filing or recording any financing statement or other instrument or document (including, without limitation any mortgages or leasehold mortgages), or the taking of any other action whatsoever which may otherwise be required under the law of any jurisdiction to validate or perfect the Rollover Liens or to entitle FNBS or the Junior Tax Lien Creditors, as the case may be, to the protections and priorities granted herein.

8.    **Post-petition Financing Under FNBS DIP LOC.**  Goodbear shall be allowed use of the new FNBS DIP LOC subject to all of the terms and conditions of the DIP LOC Loan Documents and only for the uses set forth in the Budget.

a.    The Debtors acknowledge and agree that access to the FNBS DIP Line is needed to preserve, protect and to fund ongoing operations of both of the Debtors' businesses.

b.    All obligations of the Debtors under the FNBS DIP Line accruing Post-petition shall be referred to herein and shall constitute Debtor in Possession Obligations (the "DIP Obligations").

c.    Pursuant to 11 U.S.C. § 364I(1), to secure the DIP Obligations FNBS is hereby granted the Superpriority Claim as described above.

d.    As further security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation of filing of

12

4912-4454-2093, v. 7

mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the following security interests and liens and other protections are hereby granted to and for the benefit of FNBS as follows (the "DIP Liens"):

  i.    First Lien on Cash Balances and Unencumbered Property.  Pursuant to 11 U.S.C. § 364I(2), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all pre-petition and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, non-avoidable and enforceable liens.

  ii.   The previously granted Rollover and Replacement Liens shall also serve as collateral for repayment of the new FNBS DIP LOC.

  iii.  The new FNBS DIP LOC is hereby cross-collateralized with the Atlas Mortgage Loan and all of the Loan Documents set forth on Schedule A, and liens granted thereunder, shall serve as collateral for the new FNBS LOC without need for filing or further perfection.

  e.    Authorization of the Facility and the Loan Documents.  Goodbear is hereby authorized to use the FNBS DIP LOC in accordance with the approved Budget and terms of this Interim Order and the DIP Loan Documents, which shall be used only for purposes permitted under the new DIP Loan Agreements and the accompanying Budgets.

  f.    No other DIP Borrowing.  Unless all DIP Obligations shall have been paid in full, the Debtors shall not seek, and it shall constitute an Event of Default if the Debtors seek, or if there is entered, (i) any modifications or extensions of this Interim Order without the prior written consent of FNBS, and no such consent shall be implied by any other action, inaction or acquiescence by FNBS, or (ii) an order dismissing this case.  If an order dismissing this case

13

under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claim and DIP Liens granted to FNBS pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid and satisfied in full (and that such Superpriority Claim and other protections and liens granted hereunder, shall, notwithstanding such dismissal, remain binding on all parties in interest and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

g.    Survival of Relief Granted.

i.    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations incurred prior to the actual receipt of written notice by FNBS of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby with respect to any DIP Obligations.  Notwithstanding any such reversal, stay, modification or vacation, any DIP Obligations incurred by the Debtors prior to the actual receipt of written notice by FNBS of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and FNBS shall be entitled to all the rights, remedies, privileges and benefits granted in section 364I of the Bankruptcy Code, this Interim Order and pursuant to the FNBS Line of Credit with respect to all DIP Obligations.

14

ii.       Except as expressly provided in this Interim Order, the DIP Liens, the Superpriority Claims and all other rights and remedies of FNBS granted by the provisions of this Interim Order and the FNBS DIP LOC shall survive, and shall not be modified, impaired or discharged by the entry of an order converting these cases to cases under chapter 7.  The terms and provisions of this Interim Order and the DIP Loan Documents shall continue in this case or in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the Superpriority Claim and all other rights and remedies of FNBS granted by the provisions of this Interim Order and the DIP Loan Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full.

h.       Limitation on Use of Proceeds and Cash Collateral.  Notwithstanding anything herein or in any other order by this Court to the contrary, the FNBS DIP LOC shall be used exclusively for the purposes set forth in the Budget.

i.       Interim Order Governs.  In the event of any inconsistency between the provisions of this Interim Order and the FNBS DIP LOC or any prior order of this Court, the provisions of this Interim Order shall govern.

j.       Binding Effect; Successors and Assigns.  The FNBS DIP Loan Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in this case, provided, however, that FNBS shall have no obligation to allow access to the FNBS DIP LOC to any chapter 7 or 11 trustee or similar responsible person appointed for the estates of the Debtors.

k.       Right to Refuse Advance Requests.  Provided the Borrowers are not in default and a request for an Advance will not result in the total outstanding principal balance on the

15

LOC to exceed the maximum permitted amount, Lender shall make Advances in accordance with the Budget approved by the DIP Order.

9.      **Automatic Stay**.  This Interim Order shall be without prejudice to FNBS's right to seek relief from the automatic stay under section 362 of the Bankruptcy Code on any basis at any time upon notice to the Debtors and this Court.  The rights of the Debtors to oppose such relief, other than as a result of an uncured Event of Default by the Debtors under the terms of this Interim Order, are reserved.  Subject to section 362 of the Bankruptcy Code, this Interim Order does not and shall not constitute a waiver by FNBS of any right which it may have with respect to the Prepetition Collateral or other property of the Debtors or their estates, including, without limitation, its rights as a secured party under the Loan Documents, the Uniform Commercial Code, and other applicable law.  The automatic stay imposed by section 362(a) of the Bankruptcy Code shall be, and hereby is, modified to the extent necessary to effectuate the requirements of this Interim Order.

10.      **Carve-Out**. For the purposes of this Interim Order, the Rollover Liens are subject to a "Carve-Out", which term shall mean an amount sufficient to satisfy any quarterly fees owed to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), plus the amount of $75,000 to pay any Court approved fees and expenses of professionals retained by the Debtors, to the extent incurred on or before 20 days after a declared Event of Default hereunder; and $7,500.00 for the expenses and commissions of a Chapter 7 trustee.  For purposes of clarity, this Carve-Out is the total to be granted in the aggregate between Debtors' two cases.  The Carve-Out shall survive conversion of the cases to Chapter 7.

11.      **Lien Challenge**.  The rights of any creditor, party in interest or creditors' committee to dispute or challenge the validity, perfection, extent, amount and priority of FNBS's claims and liens (collectively, a "Lien Challenge") and/or the right to dispute FNBS's right to

16

any adequate protection payments authorized under this Interim Order are expressly preserved for thirty (30) days from the date that counsel for a creditors' committee has been retained, if a creditors' committee is formed, and all other parties in interest (aside from the Debtors) are afforded forty-five (45) days after entry of any successive interim order or the Final Order (whichever is earlier) (the "Lien Challenge Deadline").  Notwithstanding anything to the contrary in this Interim Order, no Prepetition Collateral, including any Cash Collateral and the Carve-Out, shall be used in any manner to challenge or attempt to avoid FNBS's claims against the Debtors under or pursuant to this Interim Order or any Loan Documents, nor shall it be used to challenge or attempt to avoid the validity, perfection, or priority of any security interests, liens, assignments, or pledges granted or made by the Debtors to FNBS under or pursuant to this Interim Order or any Loan Documents.

12.     **Termination**.  In the absence of a further order of the Court, the Debtors' authorization to use the Cash Collateral shall automatically terminate on any of the following events of default:

a.      the Debtors' failure to comply with any of the terms or provisions of this Interim Order, including providing the Adequate Protection as set forth herein, and the failure of the Debtors to cure such breach within seven (7) days of receiving notice of same; e-mail notification sent to Debtors' counsel shall be sufficient notice of an event of default hereunder;

b.      the Debtors' making of a payment that was not approved by FNBS through its approval of the Budget or, for a payment outside of the Budget, made without FNBS' prior written consent to such payment;

c.      any stay, reversal, vacatur or rescission of the terms of this Interim Order;

d.      the Debtors' actual cash disbursements vary from the approved Budget in excess of the Permitted Variance;

17

e.      the Court entering an order granting relief from the automatic stay with respect to any of the Debtors' assets with a value greater than $50,000;

f.      entry of an order by this Court dismissing one or both of the Debtors' Chapter 11 cases or converting one or both of the Debtors' Chapter 11 cases to a case under Chapter 7 of the Bankruptcy Code;

g.      the appointment of a chapter 11 trustee or the appointment of an examiner.

After the occurrence of any event of default, the Debtors shall be permitted to seek Court authority, after notice and a hearing, to use the Cash Collateral or other property of the Debtors; provided, however, that FNBS shall have the right to object to such use.

13.      **Good Cause**.  Good cause has been shown for the entry of this Interim Order. Among other things, entry of this Interim Order will permit the Debtors to continue operating their business and pay their continuing expenses and employee expenses.

14.      **Good Faith**.  The Adequate Protection arrangements authorized hereunder have been negotiated in good faith and the terms of such Adequate Protection are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

15.      **Best Interests of the Debtors and Estates**.  The Debtors requested interim relief pursuant to Bankruptcy Rule 4001.  The authority granted hereby to use Cash Collateral and to enter into the Adequate Protection arrangements set forth herein is vital to avoid irreparable harm to the Debtors and their estates.  Entry of this Interim Order is in the best interests of the Debtors and their estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses.

16.      **Notice**.  Due and sufficient notice of the Motion and Interim Hearing was given.

18

17.    **No Other Liens**.  Unless otherwise provided by further order of the Court, with the exception of the Junior Rollover Liens, and except as otherwise expressly provided herein, the Debtors shall be enjoined and prohibited from at any time during the Chapter 11 case from granting liens in the Prepetition Collateral, the Post-petition Collateral or any portion thereof to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

18.    **Section 552(b).**  Subject to entry of any successive interim order or the Final Order (whichever is earlier), FNBS shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to FNBS with respect to proceeds, products, offspring, or profits of any of the Collateral.

19.    **Survival; Successors and Assigns**.  Unless otherwise set forth herein, the provisions of this Interim Order shall be binding upon and inure to the benefit of FNBS, the Debtors and their respective successors and assigns (including, to the extent permitted by applicable law, any Chapter 7 or Chapter 11 trustee or other fiduciary hereafter appointed or elected for the estate or as a legal representative of the Debtors or with respect to the property of the estate of the Debtors).  If an order dismissing this Chapter 11 case under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that the Rollover Liens and other protections afforded or granted to FNBS pursuant to this Interim Order as of the date of such dismissal shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all obligations in respect thereof shall have been paid and satisfied in full (and that such rollover liens and other protections, shall, notwithstanding such dismissal, remain binding on all parties in interest).  Notwithstanding any reversal, stay, modification or vacatur of this Interim Order, any use of the Cash Collateral prior to such reversal, stay, modification or vacatur shall be governed

19

in all respects by the original provisions of this Interim Order, and FNBS shall be entitled to all the rights, remedies, privileges and benefits granted herein with respect to such use. The Rollo-ver Liens shall not be discharged by the entry of an order confirming a Chapter 11 plan in any of the Debtor's Chapter 11 case.

20. **Immediate Effect**. This Interim Order shall constitute the Court's findings of fact and conclusions of law and shall take effect immediately upon execution hereof, notwithstanding any otherwise applicable stay including Bankruptcy Rules 4001 and 6004.

21. **Subsequent Hearings**. A subsequent hearing on the Motion shall be held by this Court on _____, 2026 at ____ a/p.m. The Court shall determine in its discretion if this hearing will be the final hearing on cash collateral or an interim hearing. Any objections or re-sponses to the Motion or to entry of a final order granting the relief requested in the Motion (the "Final Order") shall be filed and served no later than seven (7) business days before the Final Hearing and shall be served upon the Court and the following parties: (i) the Debtor, at R3M Law, LLP, 437 Madison Avenue, 24th Floor, New York, New York 10022, Attn: Howard P. Magaliff, Esq.; (ii) Office of the United States Trustee for the Northern District of New York, 11A Clinton Avenue, Room 620, Albany, NY 12207; (iii) counsel for FNBS, at Lemery Greisler LLC, 677 Broadway, 8th Floor, Albany, New York, Attn: Paul A. Levine, Esq. and Meghan Breen, Esq.; (iv) the Debtors' Top 20 Creditors; and (v) any other party requesting service. In the event no objections or responses are timely filed and served in accordance with the forego-ing, the Court may enter a Final Order without need for the final hearing.

22. **Retention of Jurisdiction**. The Court shall retain jurisdiction to hear and deter-mine all matters arising from or related to the implementation of this Interim Order.

# # #

20

4912-4454-2093, v. 7

## SCHEDULE A

Summary of loans and loan documents between Debtors Atlas Land Holdings, LLC ("Atlas") and Goodbear Property, LLC ("Goodbear") as Borrowers and First National Bank of Scotia ("FNBS").

**Mortgage Loan:**

- Loan Agreement dated February 17, 2023 by and between Atlas and Goodbear as borrowers and FNBS as lender.

- Amended and Restated Mortgage Note dated February 17, 2023 in the original principal amount of $4,140,304.00 by and between Atlas and Goodbear as borrowers and FNBS as lender.

- Amended and Restated Mortgage and Security Agreement (with Assignment of Leases and Rents) and Consolidation Agreement dated February 17, 2023 by and between Atlas Land Holdings, LLC as mortgagor and FNBS as mortgagee recorded March 3, 2023 in the Warren County Clerk's Office as Instrument No. 2023-1191.

- Commercial Guaranty dated February 17, 2023 executed by Jaclyn M. Iarossi, Saara Maherali and Alim Maherali.

**Line of Credit:**

- Loan Agreement (Revolving Line of Credit) dated February 17, 2023 by and between Goodbear as borrower and FNBS as lender.

- Revolving Line of Credit Note dated February 17, 2023 in the original principal amount of $100,000.00 by and between Goodbear as borrower and FNBS as lender.

- Security Agreement dated February 17, 2023 by and between Goodbear as borrower and FNBS as lender.

- Commercial Guaranty dated February 17, 2023 executed by Jaclyn M. Iarossi, Saara Ma-

  herali and Alim Maherali.

- Overdraft Repayment Demand Note dated April 30, 2026 in the principal amount of

  $232,182.35.

ii

## **EXHIBIT 1**

**DIP Loan Documents**

## DEBTOR-IN-POSSESSION LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement"), made this 30th day of April, 2026, is by and between **ATLAS LAND HOLDINGS, LLC** and **GOODBEAR PROPERTY LLC** (each, a "Borrower," and collectively, the "Borrowers") and **FIRST NATIONAL BANK OF SCOTIA** ("Lender").

## BACKGROUND

WHEREAS, Borrowers are each debtors-in-possession under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code (the "Bankruptcy Cases"), pending in the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court"); and

WHEREAS, Borrowers require funding to maintain the value of their assets and ensure continued operations pending a sale of substantially all of their assets in the Bankruptcy Cases; and

WHEREAS, subject to the approval of the Bankruptcy Court, Lender agrees to loan and Borrowers agree to borrow up to $250,000.00 as debtor in possession financing pursuant to section 364 of the Bankruptcy Code (the "DIP Loan") subject to the limitations set forth herein; and.

WHEREAS the Lender is a lender to the Borrowers pursuant to the loan documents set forth on Schedule A hereto which, among things, granted to Lender a first priority lien on all of the Borrower's assets, both real and personal property (the "Prepetition Loans" and "Prepetition Collateral").

**NOW, THEREFORE**, in consideration of the premises, and of the mutual promises and undertakings of the parties set forth herein, and as an inducement for Lender to advance sums to Borrowers, and intending to be legally bound hereby, the parties hereto agree as follows:

## SECTION 1. THE LOAN

1.1     Amount and Use of DIP Loan. Lender shall lend to Borrowers and Borrowers shall borrow from Lender an amount not to exceed $250,000.00subject to the terms and conditions contained herein and in the Note set forth below. The Loan shall be made and utilized specifically subject and pursuant to the budget attached hereto.

1.2     Interest and Payment. The DIP Loan shall bear interest and shall be repaid at the rate of 6.95% per annum, with all interest accruing under the DIP Loan to be payable in cash by Borrowers or pursuant to a credit bid on the Maturity Date.

1.3     Loan Documents.

(a)     Note. Borrowers' obligation to repay the DIP Loan will be evidenced by a promissory note in the principal amount of $250,000.00, providing for the loan payment of principal, together with interest on said principal calculated at the rate of 6.95% per annum, on terms consistent with this Agreement (the "FNBS LOC Note"). The Borrowers' obligation to

{LG 00941453 1 }1

149886321_2

repay the DIP Loan shall also be evidenced by the order of the Bankruptcy Court approving the Borrowers' entry into this Agreement.

1.4     Security and Collateral for the DIP Loan. To induce the Lender to make the DIP Loan, Borrowers hereby grant to Lender, as security for the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of the DIP Loan, (i) a senior secured priming lien and security interest under section 364(d) of the Bankruptcy Code in all of Borrowers' Prepetition Collateral and any assets, both real and personal property, acquired post-petition (together, the "Collateral"), and (ii) a super-priority administrative expense claim under section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code. Notwithstanding the foregoing, the Lender's liens and super-priority claims granted hereunder are subject to the $75,000.00 professional fee carve-out set forth in the Interim Order (A) Authorizing the Debtor's Use of Cash Collateral, (B) Granting Adequate Protection Pursuant to §§105, 361 and 363 of the Bankruptcy Code, (C) Authorizing Postpetition Financing Pursuant to §364 of the Bankruptcy Code, and Granting (D) Related Relief (Dkt. No. ____).

1.5     Additional Documents; Filing Fees. This Agreement and the Note , and all additional documents, instruments, agreements, guaranties and assignments (individually and together referred to as the "DIP Loan Documents") shall be in form and substance satisfactory to Lender and Lender's counsel, and all necessary filing and recording fees with respect thereto (if any) shall be paid by Borrowers.

1.6     Maturity Date. This Agreement and the Borrowers' right to use proceeds of the DIP Loan shall automatically terminate without further notice or court proceedings, unless extended with the prior written consent of the Lender, on the earlier of: (i) the date of acceleration of any outstanding borrowings under the DIP Loan pursuant to an Event of Default; (ii) the closing date of the sale of the Borrowers' assets; or (iii) November 1, 2026, 2026, unless the closing of the sale of the Borrowers' assets is delayed and such delay is attributable to acts or omissions of the Lender (each constituting the "Maturity Date").

## SECTION 2. BORROWERS' REPRESENTATIONS AND WARRANTIES

Each Borrower hereby represents and warrants to Lender (which representations and warranties shall survive until the DIP Loan has been paid and satisfied in full and the Loan Documents have been terminated) that:

2.1     Power and Authority; Authorization; Enforceability. Subject to approval by the Bankruptcy Court, Borrower has full power, authority and legal right to execute, deliver and comply with each of the documents or instruments relating to the DIP Loan to be executed by it (the "DIP Loan Documents"). Subject to approval by the Bankruptcy Court, the DIP Loan Documents and such other documents and instruments shall constitute the valid and legally binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

2.2     Governmental Approval. Other than approval by the Bankruptcy Court to enter into this Agreement and borrow the DIP Loan, no further consent, approval or other

authorization of or by any court, administrative agency or other governmental authority is required in connection with Borrower's execution, delivery or performance of or compliance with any of the DIP Loan Documents or any other document or instrument relating to the DIP Loan or in connection with Borrower's consummation of the transactions contemplated thereby.

2.3    Conflict. Borrower's execution and delivery of and compliance with the DIP Loan Documents and any other documents and instruments relating to the DIP Loan will not conflict with or result in a breach of any applicable law, judgment, order, writ, injunction, decree, rule or regulation of any court, administrative agency or other governmental authority, or other document or instrument to which Borrower is a party or by which it is bound or affected (other than any loan documents between the Borrowers and Lender, and such action by Borrower will not result in the creation or imposition of any lien, charge or encumbrance upon any property of Borrower in favor of anyone other than Lender.

2.4    Litigation. Except for the Bankruptcy Cases, there is no action, suit or proceeding pending or threatened against or affecting the Borrower before or by any court, administrative agency or other governmental authority, or which brings into question the validity of the transactions contemplated hereby.

2.5    Payment of Premiums. All premiums and other charges relating to all insurance required hereunder due and payable as of the date hereof have been paid in full.

2.5    No Brokers. Borrower has not dealt with any broker in connection with the transactions contemplated by this Agreement. Borrower hereby indemnifies and holds harmless Lender from and against any and all claims for brokerage commissions and other similar compensation made in connection with the transactions contemplated in this Agreement.

2.6    Accuracy of Representations and Warranties. No representation or warranty by Borrower contained herein or in any certificate or other document furnished by Borrower pursuant hereto or in connection herewith fails to contain any statement of material fact necessary to make such representation or warranty not misleading in light of the circumstances under which it was made. There is no fact which Borrower knows or should know and has not disclosed to Lender, which does or may materially and adversely affect Borrower or its operations.

## SECTION 3. BORROWERS' COVENANTS

Each Borrower hereby covenants and agrees that, until the DIP Loan has been paid and satisfied in full and the Loan Documents have been terminated:

3.1    Use of DIP Loan Proceeds. Except as authorized by Lender in advance and in writing, Borrowers shall utilize proceeds of the DIP Loan strictly in accordance with Section 1.1 herein.

3.2    Intentionally Omitted.

{LG 00941453 1 }3

149886321_2

3.3    Compliance with Laws. Borrower will comply with all requirements of all applicable federal, state and local statutes, laws, rules and regulations (including environmental regulations) and all orders of regulatory agencies and authorities applicable to Borrower.

3.4    Notices. Borrower will promptly notify Lender of: (a) any action or proceeding brought against Borrower; (b) the occurrence of any Event of Default hereunder or under any of the Loan Documents; (c) any fact, condition or event if known which, with the giving of notice or the passage of time or both, could become an Event of Default hereunder or under any of the Loan Documents; (d) the failure of Borrower to observe any of its undertakings under the Loan Documents; or (e) any change in any fact or circumstances represented or warranted by Borrower herein or in any of the Loan Documents or any material adverse change in the assets, business, operations or financial condition of Borrower.

3.5    Evidence of Payment of Premiums. All premiums and other charges relating to all insurance required hereunder that are due and payable on a go-forward basis following the date hereof shall be paid without penalty or interest, and evidence thereof shall be delivered to Lender contemporaneously with such payment.

3.6    Guarantees. Without the express prior written consent of the Lender, Borrower shall not assume, guarantee, endorse or otherwise become contingently liable upon, or responsible for, any obligations of others, except to endorse checks or drafts in the ordinary course of business.

3.7    Additional Documents and Future Actions. Borrower shall, at its sole cost and expense, take such actions and provide Lender from time to time with such agreements, financing statements and additional instruments, documents or information as Lender may in its discretion deem necessary or advisable to perfect, protect, maintain or enforce the security interests in the Collateral, to permit Lender to protect or enforce its interest in the Collateral, or to carry out the terms of the Loan Documents. Borrower hereby authorizes and appoints Lender as its attorney-in-fact, with full power of substitution, to take such actions as Lender may deem advisable to protect the Collateral and its interests therein and its rights hereunder, to execute on Borrower's behalf and file at Borrower's expense financing statements, and amendments thereto, in those public offices deemed necessary or appropriate by Lender to establish, maintain and protect a continuously perfected security interest in the Collateral, and to execute on Borrower's behalf such other documents and notices as Lender may deem advisable to protect the Collateral and its interests therein and its rights hereunder. Such power, being coupled with an interest, is irrevocable. Borrower irrevocably authorizes the filing of a carbon, photographic or other copy of this Agreement, or of a financing statement, as a financing statement and agrees that such filing is sufficient as a financing statement.

3.8    Maintenance of Insurance. Borrower shall obtain and maintain in full force and effect at all times during the term of the Loan all of its existing insurance policies, and Borrower shall name Lender as loss payee on all policies of insurance covering assets in which Lender has a security interest. Receipt of any policies or certificates of insurance shall not bar Lender from requiring other or additional insurance which Lender reasonably requires due to changed circumstances.

All insurance policies required hereunder shall be issued by companies, and shall be in amount and in form, satisfactory to Lender.

## SECTION 4. CONDITIONS PRECEDENT

The obligations of Lender to make the DIP Loan are subject to the satisfaction of the following conditions precedent at the time the DIP Loan is made:

4.1     Representations and Warranties. Each and all of the representations and warranties set forth in Section 2 hereof shall be true and correct in all respects as though separately and independently made on and as of the date the DIP Loan proceeds are advanced.

4.2     Covenants. Each and all of the covenants set forth in Section 3 hereof shall have been performed and complied with in all respects.

4.3     No Default. There shall be no Event of Default in existence under any of the Loan Documents that has not been waived by Lender.

4.4     Delivery of DIP Loan Documents. The DIP Loan Documents shall have been duly executed on behalf of Borrowers and delivered to Lender and, where applicable, shall have been recorded or filed in the appropriate public office.

4.5     Delivery of Other Documents. Borrowers shall deliver to Lender such other documents as may be required by Lender in its discretion to evidence and secure the DIP Loan or as may be required by Lender in its discretion to comply with the terms hereof or of any of the DIP Loan Documents or to comply with the requirements of regulatory authorities to which Lender is subject.

4.6     Bankruptcy Court Approval. The Bankruptcy Court shall have entered a stipulated order, in form and substance acceptable to Lender in its sole discretion, authorizing Borrower to enter into and perform under this Agreement, obtain the DIP Loan, approving the DIP Loan Documents and granting Lender, among other things, the liens and security interest in the Collateral and the super-priority administrative expense claim described in section 1.4 hereof.

## SECTION 5. LIMITATION OF LENDER'S LIABILITY

The rights and benefits of this Agreement shall not inure to the benefit of any third party. Notwithstanding anything to the contrary contained in this Agreement or in any of the other Loan Documents, or any conduct or course of conduct by Borrowers or Lender or their respective affiliates, agents or employees, neither this Agreement nor any of the DIP Loan Documents shall be construed as creating any rights, claims or causes of action against Lender in favor of any other person or entity other than Borrowers.

149886321_2

## SECTION 6. INDEMNITY

Borrowers, for themselves and all those claiming under or through them, agree to protect, indemnify, defend and hold harmless Lender, its directors, officers, employees and attorneys, agents and representatives, from and against any and all liability, expense or damage or any kind or nature and from any suits, claims or demands, including legal fees and expenses, arising out of this Agreement or the DIP Loan Documents or in connection therewith except for claims arising under this Agreement or the DIP Loan Documents or resulting directly from Lender's gross negligence or willful misconduct.

## SECTION 7. DEFAULTS

7.1     Events of Default. In addition to any other event referred to herein, the occurrence of which, by the terms hereof, constitutes an event of default hereunder, the occurrence of any one or more of the following events shall constitute an event of default hereunder (an "Event of Default"):

(a)     Borrowers fail to make any payment of principal, interest or both within five (5) business days after the date when due to Lender under this Agreement or under any of the other DIP Loan Documents, whether at maturity or by acceleration or otherwise; or

(b)     Borrowers fail to observe and perform any of the covenants or agreements on their part to be observed or performed under this Agreement or under any of the other DIP Loan Documents (other than as set forth in the preceding subparagraph (a)), and such failure shall not have been remedied within ten (10) days of when such performance is required hereunder; or

(c)     Any event of default occurs under the terms of any of the other Loan Documents; or

(d)     If any representation or warranty made or furnished by Borrowers herein or in any other instrument or document executed and delivered in connection with the DIP Loan evidenced by this Agreement shall prove to be false or misleading in any material respect; or

(e)     Subject to variances permitted by the DIP Order, Borrowers fail to remain in compliance with the Budget, or make any payment or distribution not authorized or approved under the Budget or by the Lender; or

(f)     The Bankruptcy Case of either Borrower is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, a chapter 11 trustee or examiner with enlarged powers is appointed in the bankruptcy case of a Borrower; or any other super-priority claim or grant of any other lien which is *pari passu* or senior to the DIP Loan and the liens securing the DIP Loan is granted or allowed in favor of any party other than Lender in the bankruptcy case of a Borrower; or

(g)     The filing of any plan of reorganization or a plan of liquidation without the prior written consent of the Lender, or the Borrowers seek or support confirmation of a plan of reorganization or liquidation that is not acceptable to the Lender; or

149886321_2

(h)     The Borrowers or any party engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the Lender's liens on or security interest in the assets of a Borrower securing the DIP Loan, except to the extent that a party other than a Borrower challenges such liens during the challenge period provided for by the DIP Order; or

(i)     The Borrowers abandon the proposed sale of their assets, or the sale is otherwise terminated without the Lender's written consent, or the Borrowers seek to sell all or substantially all of its assets and such sale does not provide for the payment in full in cash of the Borrowers' obligation under the DIP Loan to the Lender; or

(j)     The Borrowers utilize proceeds of the DIP Loan for any purpose other than those specifically authorized herein and in accordance with the DIP Order, or those otherwise specifically authorized in writing and in advance by Lender; and

(k)     The Maturity Date occurs without the Borrowers' having repaid the DIP Loan in full including all accrued interest.

7.2     Remedies.

(a)     Upon the occurrence of any Event of Default the entire unpaid principal balance hereunder plus all interest accrued thereon and all other sums due and payable to Lender under any of the Loan Documents shall, at the option of Lender, become due and payable immediately without presentment, demand, notice of nonpayment, protest, notice of protest or other notice of dishonor, all of which are hereby expressly waived by Borrowers.

(b)     In addition to the foregoing, upon the occurrence of any Event of Default, Lender may forthwith exercise singly, concurrently, successively or otherwise any and all rights and remedies available to Lender under any of the DIP Loan Documents or with respect to any Collateral, or available to Lender by law, equity or otherwise.

7.3     Remedies Cumulative, Etc.

(a)     No right or remedy conferred upon or reserved to Lender under any of the DIP Loan Documents, or with respect to any guaranty of payment of the DIP Loan or of performance of any of Borrowers' obligations under any of the Loan Documents or any Collateral, or now or hereafter existing at law or in equity or by statute or other legislative enactment, is intended to be or shall be deemed exclusive of any other such right or remedy, and each and every such right or remedy shall be cumulative and concurrent, and shall be in addition to every other such right or remedy, and may be pursued singly, concurrently, successively or otherwise, at the sole discretion of Lender, and shall not be exhausted by any one exercise thereof but may be exercised as often as occasion therefore shall occur. No act of Lender shall be deemed or construed as an election to proceed under any one such right or remedy to the exclusion of any other such right or remedy; furthermore, each such right or remedy of Lender shall be separate, distinct and cumulative and none shall be given effect to the exclusion of any other. The failure to exercise or any delay in exercising any such right or remedy, or the failure to insist upon strict performance of any term of any of the DIP Loan Documents, shall not be construed as a waiver or release of the same, or of any event of default thereunder, or of any obligation or liability of Borrowers thereunder. Nothing herein, however, shall be construed to

{LG 00941453 1 }7

149886321_2

prevent Lender from waiving any condition, obligation or default it should so elect. In the event of such election by Lender, any waiver, in order to be effective, must be in writing and signed by Lender, and any such waiver shall be strictly limited in its effect to the condition, obligation or default specified therein and shall not extend to any subsequent condition, obligation or default or impair any right of Lender with respect thereto.

(b)    The recovery of any judgment by Lender and/or the levy of execution under any judgment shall not affect in any manner or to any extent liens or other security interests in any Collateral or any rights, remedies or powers of Lender under any of the Loan Documents or with respect to any Collateral, but such liens and security interests, and such rights, remedies and powers of Lender, shall continue unimpaired as before. Further, the entry of any judgment by Lender shall not affect in any way the interest rate payable under any of the Loan Documents on any amounts due to Lender, but interest shall continue to accrue on such amounts as specified herein or in the Note (if applicable).

(c)    Borrowers hereby waive presentment, demand, notice of nonpayment, protest, notice or protest, or other notice of dishonor, and any and all other notices in connection with any default in the payment of, or any enforcement of the payment of, the DIP Loan. Borrowers further waive and release all procedural errors, defects and imperfections in any proceedings instituted by Lender under the terms of any of the Loan Documents or with respect to any Collateral.

7.4    Jurisdiction; Venue. Borrowers agree that any action or proceeding against it to enforce the DIP Loan may only be commenced in the Bankruptcy Court or, with leave of the Bankruptcy Court or in the event that the Bankruptcy Court determines that it does not have jurisdiction over such dispute, in the state or federal court located or with jurisdiction in Warren Count, State of New York, and Borrowers waive personal service of process and agree that a summons and complaint commencing an action or proceeding in any such court shall be properly served and shall confer personal jurisdiction if served by registered or certified mail in accordance with the notice provisions set forth herein.

7.5    Waiver of Subrogation. Borrowers hereby waive any right to subrogation, reimbursement, contribution or indemnity from Lender in connection with any of Borrowers' obligations hereunder.

## SECTION 8. MISCELLANEOUS

8.1    Time of the Essence. All dates and times for the performance of Borrowers' obligations set forth herein shall be deemed to be of the essence of this Agreement.

8.2    Successors and Assigns. This Agreement inures to the benefit of and binds the parties hereto and their respective successors and assigns, and the words "Borrower" and "Lender" whenever occurring herein shall be deemed to include such respective successors and assigns. However, Borrowers shall not voluntarily, or by operation of law, assign or transfer any interest which they may have under this Agreement or in the proceeds of the DIP Loan, without the prior written approval of Lender. Lender may assign or otherwise transfer the DIP Loan and any or all of the Loan Documents to any other person, and in connection thereto deliver to any

{LG 00941453 1 }8

149886321_2

such assignee or transferee any and all information regarding Borrowers or the Loan Documents. Such assignee or transferee shall thereupon become vested with all of the benefits in respect thereof granted to Lender herein or otherwise. Any assignee or transferee shall not modify this Agreement or any DIP Loan Document except as provided herein.

      8.3    Notices. All notices required or desired to be given to either of the parties hereunder shall be in writing and shall be deemed to have been sufficiently given for all purposes when presented personally to such party or sent by certified or registered mail, return receipt requested, or via Federal Express or other next-day delivery service to such party at its address set forth below:

| | |
|---|---|
| Borrower: | Goodbear Property, LLC<br>Atlas Land Holdings, LLC<br>Attn: Jaclyn M. Iarossi<br>5 Hilltop Lane<br>Brewster, NY 10509 |
| With a copy to: | Howard P. Magaliff, Esq.<br>R3M Law, LLP<br>437 Madison Avenue, 24th Floor<br>New York, NY 10022 |
| Lender: | First National Bank of Scotia<br>Attention: Christopher Hebbard, Lending Officer<br>and Senior Vice President<br>201 Mohawk Avenue<br>Scotia, NY 12302 |
| With a copy to: | Paul A. Levine, Esq.<br>Lemery Greisler LLC<br>677 Broadway, 8th Floor<br>Albany, NY 1227 |

      Such notice shall be deemed to be given when received if delivered personally, two days after the date mailed, if sent by certified or registered mail, return receipt requested, or one day after the date deposited with Federal Express or any other next-day delivery service, and instantaneously if emailed (except if a bounce-back email from the server is received by the sender, stating that the message is undeliverable). Any notice of any change in such address shall also be given in the manner set forth above. Whenever the giving of notice is required, the giving of such notice may be waived in writing by the party entitled to receive such notice.

      8.4    Definitions; Numbers and Gender. In the event Borrowers consist of more than one person or entity, the obligations and liabilities hereunder of each of such persons and entities shall be joint and several, and the word "Borrower" shall mean all, some or any of them. For

149886321_2

purposes of this Agreement, the use of any gender shall be deemed to include all genders. The singular member shall include the plural, and the plural the singular, as the context may require.

8.5     Captions. The captions or headings of the paragraphs of this Agreement are for convenience only and shall not control or affect the meaning or construction of any of the terms of provisions of this Agreement.

8.6     Governing Law. This Agreement shall be governed by and construed accordance with the laws of the State of New York.

8.7     [Reserved].

8.8     Modification, Waiver, Consent. Any modification or waiver of any provision of this Agreement, or any consent to any departure by Borrowers therefrom, shall not be effective in any event unless the same is in writing and signed by Lender, in which event such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given. Any notice to or demand on Borrowers not specifically required of Lender hereunder shall not entitle Borrowers to any other or further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

8.9     Severability. If any provision of this Agreement is prohibited by, or is unlawful or unenforceable under, any applicable law of any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof; provided, however, that any such prohibition in any jurisdiction shall not invalidate such provision in any other jurisdiction; and provided, further, that where the provision of any such applicable law may be waived, it is hereby waived by Borrowers to the full extent permitted by law to the end that this Agreement shall be deemed to be a valid and binding agreement in accordance with its terms.

8.10     Counterparts. This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute only one agreement.

8.11     Delay or Omission Not Waiver. Neither the failure nor any delay on the part of Lender to exercise any right, remedy, power or privilege under the Loan Documents upon the occurrence of any Event of Default or otherwise shall operate as a waiver thereof or impair any such right, remedy, power or privilege. No waiver of any Event of Default shall affect any later Event of Default or shall impair any rights of Lender. No single, partial or full exercise of any rights, remedies, powers and privileges by the Lender shall preclude further or other exercise thereof. No course of dealing between Lender and Borrowers shall operate as or be deemed to constitute a waiver of Lender's rights under the Loan Documents or affect the duties or obligations of Borrowers.

8.12     Waivers. In connection with any proceedings under the Loan Documents, including, without limitation, any action by Lender in replevin, foreclosure or other court process or in connection with any other action related to the Loan Documents or the transactions contemplated hereunder  and provided, that nothing in this Agreement is intended or shall be construed as a waiver by the Borrower of the applicability of the automatic stay of section 362 of

149886321_2

the Bankruptcy Code, subject to the Lender's rights under section 362(d) of the Bankruptcy Code, each Borrower waives:

       (a)    all benefits under any present or future laws exempting any property, real or personal, or any part of any proceeds thereof from attachment, levy or sale under execution, or providing for any stay of execution to be issued on any judgment recovered under any of the Loan Documents or in any replevin or foreclosure proceeding, or otherwise providing for any valuation, appraisal or exemption;

       (b)    presentment for payment, demand, notice of demand, notice of nonpayment, protest and notice of protest of any of the Loan Documents;

       (c)    any requirement for bonds, security or sureties required by statute, court rule or otherwise;

       (d)    any demand for possession of Collateral prior to commencement of any suit; and

    8.13    Forbearance. Lender may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the Loan Documents, without notice to Borrowers.

    **8.14**    **Waiver of Right to Trial by Jury. BORROWERS WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER ANY OF THE LOAN DOCUMENTS OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF BORROWERS WITH RESPECT TO ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE. BORROWERS AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF BORROWERS TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. BORROWERS ACKNOWLEDGE THAT THEY HAVE HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THIS SECTION, THAT IT THEY FULLY UNDERSTAND ITS TERMS, CONTENT AND EFFECT, AND THAT THEY VOLUNTARILY AND KNOWINGLY AGREE TO THE TERMS OF THIS SECTION.**

149886321_2

**8.15**   <u>Signatures.</u> A signed copy of this Agreement delivered by electronic means, including but not limited to PDF, email transmission, or via an electronic signature platform such as DocuSign, Adobe Sign, or similar service, shall be deemed to have the same legal effect as delivery of an original signed copy. The parties agree that electronic signatures shall be deemed to be original signatures for all purposes under this Agreement and shall be binding to the same extent as handwritten signatures.

[signature page follows]

149886321_2

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement on the date first set forth above.

LENDER:
First National Bank of Scotia

By: Christopher Hebbard, Lending Officer
and Senior Vice President

BORROWERS:

ATLAS LAND HOLDINGS, LLC

Name: Jaclyn M. Iarossi
Title: Managing Member

GOODBEAR PROPERTY LLC

Name: Jaclyn M. Iarossi
Title: Managing Member

149886321_2

## SCHEDULE A

Summary of loans and loan documents between Debtors Atlas Land Holdings, LLC ("Atlas") and Goodbear Property, LLC ("Goodbear") as Borrowers and First National Bank of Scotia ("FNBS").

**Mortgage Loan:**

- Loan Agreement dated February 17, 2023 by and between Atlas and Goodbear as borrowers and FNBS as lender.

- Amended and Restated Mortgage Note dated February 17, 2023 in the original principal amount of $4,140,304.00 by and between Atlas and Goodbear as borrowers and FNBS as lender.

- Amended and Restated Mortgage and Security Agreement (with Assignment of Leases and Rents) and Consolidation Agreement dated February 17, 2023 by and between Atlas Land Holdings, LLC as mortgagor and FNBS as mortgagee recorded March 3, 2023 in the Warren County Clerk's Office as Instrument No. 2023-1191.

- Commercial Guaranty dated February 17, 2023 executed by Jaclyn M. Iarossi, Saara Maherali and Alim Maherali.

**Line of Credit:**

- Loan Agreement (Revolving Line of Credit) dated February 17, 2023 by and between Goodbear as borrower and FNBS as lender.

- Revolving Line of Credit Note dated February 17, 2023 in the original principal amount of $100,000.00 by and between Goodbear as borrower and FNBS as lender.

- Security Agreement dated February 17, 2023 by and between Goodbear as borrower and FNBS as lender.

149886321_2

- Commercial Guaranty dated February 17, 2023 executed by Jaclyn M. Iarossi, Saara Maherali and Alim Maherali.

**Overdraft Repayment Demand Note dated April 30, 2026 in the principal amount of $232,182.75**

- Commercial Guaranty dated April 30, 2026 executed by Jaclyn M. Iarossi

149886321_2

**DEBTOR IN POSSESSION REVOLVING LINE OF CREDIT NOTE**
**(SECURED)**

**$250,000.00**                                                          **April 30, 2026**

For value received,

**GOODBEAR PROPERTY LLC** and **ATLAS LAND HOLDINGS, LLC**, limited liability companies duly formed and existing in accordance with the laws of the State of New York, having offices located at 5 Hilltop Lane, Brewster, New York 10509 (collectively, the "Borrower"), hereby promise to pay to the order of

**FIRST NATIONAL BANK OF SCOTIA**, a banking corporation duly formed and existing in accordance with the laws of the United States of America, having its principal place of business located at 201 Mohawk Avenue, Scotia, New York 12302 (the "Lender") the principal sum of

**Two Hundred and Fifty Thousand and  00/100 DOLLARS ($250,000.00),** or so much thereof as may be advanced hereunder to the Borrower by the Lender (the "LOC"), together with interest on the unpaid principal balance outstanding at the per annum rate set forth herein, pursuant to the terms of this Note and Debtor in Possession Loan Agreement (the "DIP Agreement") between the Borrower and the Lender dated as of the date hereof (as such may be amended or replaced from time to time, the "Loan Agreement"), the terms of which are incorporated herein by reference and made a part hereof.

This Note is collateralized by the protections provided in the parties DIP Loan Documents as defined in and to be granted by the order of the United States Bankruptcy Court on Borrowers' motion to approve their entry into this note and the DIP Loan Documents generally.

I.    **DEFINITIONS:**

"**Default Interest Rate**" means the Interest Rate plus four (4%) percent per annum, not to exceed the highest rate permitted by law.

"**Interest Rate**" means a fixed rate of 6.95% per annum.

"**Maturity Date**" shall mean November 1, 2026.

II.    **INTEREST:**

A.    **Computation of Interest**.  Interest on the outstanding principal balance shall be computed on the basis of a year of three hundred sixty (360) days for the actual number of days elapsed and shall accrue from the date of advance of funds until receipt of payment by Lender.

1

B.   **Implementation of Default Interest Rate.**  The Interest Rate after the Maturity Date, whether by acceleration or otherwise, or upon the occurrence of an uncured Event of Default, as hereinafter defined, shall, in the Lender's discretion, increase to the Default Interest Rate without notice to the Borrower or further action by the Lender.

III.   **ADVANCES OF LOAN PROCEEDS:**

A.   **Advances and Readvances**.  Provided that no Event of Default, as hereinafter defined, has occurred, and provided further that the Borrower is eligible to receive advances and readvances pursuant to the terms hereof, the Borrower may request advances at any time up to the Maturity Date (collectively, "Advances" and individually an "Advance"); provided, that no Advance shall be made which, by itself, or together with the principal balance then outstanding under this Note, would bring the total outstanding principal balance due on the LOC to an amount in excess of **$250,000.00.**

B.   **Procedure for Advances**.  A written request by Jaclyn M. Iarossi, the authorized member of the Borrower, shall be made to the Lender for any Advance (effective upon receipt) specifying the date such Advance is to be made and the amount of such Advance.  Prior to any Advance, upon the Lender's request, the Borrower shall provide to the Lender such documents and information supporting or otherwise evidencing the Borrower's intended use of such Advance.  Provided the Borrower is in full compliance with all the terms and provisions hereof, the Lender, in its discretion, will make such Advance in immediately available funds. All Advances shall be deposited by the Lender in an operating deposit account maintained at the Lender (the "Deposit Account").  The deposit of any Advance in the Deposit Account by the Lender shall be conclusive proof as to the receipt of an Advance by the Borrower, and the Borrower will be responsible for repaying any Advance so made, pursuant to the terms of this Note.

C.   **Right to Refuse Advance Requests**.  Provided the Borrowers are not in default and a request for an Advance will not result in the total outstanding principal balance on the LOC to exceed the maximum permitted amount, Lender shall make Advances in accordance with the Budget approved by the DIP Order.

D.   **Record of Advances**.  Periodically the Lender will render to the Borrower a statement of the amount due hereunder, which statement shall be deemed final, binding and conclusive upon the Borrower in all respects as to all matters reflected therein, unless the Borrower, within fifteen (15) days after the date the statement is rendered, delivers to the Lender written notice of any objections the Borrower may have to the statement, in which case only those items expressly objected to in such statement shall be deemed disputed by the Borrower and the Borrower shall have thirty (30) days to dispute the basis for such items.

E.    **Condition of Advances**.  The obligation of the Lender to make any Advances shall be subject to the fulfillment of the following: (1) the Borrower shall have executed and delivered to the Lender the DIP Loan Documents and paid all sums due to the Lender hereunder, if any; (2) the Lender shall be fully satisfied the covenants set forth herein have been complied with, and the Lender shall receive such documents as the Lender may reasonably request to verify and confirm the same; and (3) no Event of Default shall have occurred.

IV.    **PAYMENT OF PRINCIPAL, INTEREST, ANNUAL REVIEW, AND REPAYMENT:**

A.    **Periodic Payments of Interest Only**.  The Borrower shall pay interest only at the Interest Rate on the unpaid principal balance of this Note on May 30, 2026 and on the 30th date of each month thereafter up to and including the Maturity Date.

B.    **Payment at Maturity Date**.  The principal balance due hereunder, together with all accrued and unpaid interest at the Interest Rate and all other charges due hereunder and under any other Loan Documents shall be due and payable in full on the Maturity Date.

C.    **Prepayment.**  The Principal due hereunder may be prepaid in whole or in part without penalty at any time provided when the Borrower shall make a Prepayment, the Borrower shall notify the Lender in writing that it is doing so.

D.    **Late Payment**.  In the event the Lender shall have not received the full amount of any payment due hereunder by the close of Lender's business on the fifteenth (15th) day after such payment shall be due, then in such event, the Borrower shall be obligated to pay to the Lender a "Late Charge" equal to four cents ($.04) for each one dollar ($1.00) so overdue for the purpose of defraying the expense incident to handling such delinquent payment.

E.    **Borrower's Termination.** The Borrower may terminate the LOC by written notice to the Lender, which termination shall be effective one (1) business day after the Lender's receipt of such notice.  Such termination shall terminate the Borrower's right to Advances; however, the LOC shall remain open and the Borrower's obligations and the remaining terms and conditions under the DIP Loan Documents shall remain in full force and effect until all amounts due under the DIP Loan Documents have been paid in full.

3

V.   **COVENANTS:**

A.   The Borrower covenants and agrees that, until the full satisfaction of the obligations and liabilities of the Borrower to the Lender under this Note and/or any Loan Document, the Borrower shall:

1.   Make or cause to be made full and timely payment of the principal, interest, and any other amounts as they become due hereunder and/or under any Loan Documents;

2.   Timely and fully comply with all of the provisions contained herein and in DIP Agreement and the DIP Loan Documents set forth at Schedule A hereto;

3.   Upon two (2) business days' notice, permit the Lender and its representatives to have access at reasonable times to any and all of the Borrower's financial records, to make abstracts from such records and to discuss the business, finances and affairs of the Borrower with its accountant and other representatives;

4.   Pay and discharge all taxes, assessments and governmental charges, of any kind, including such charges against any collateral for the LOC, on the due date thereof unless the same are being contested in good faith and in appropriate proceedings;

5.   Keep the Lender fully informed as to all matters, financial or otherwise, that may affect the Lender's interest. ;

6.   Comply at all times in all material respects with all applicable Federal, state or local laws, regulations, ordinances, rules and orders.

B.   **Negative Covenants**.  The Borrower covenants and agrees that, until the full satisfaction of the obligations and liabilities of the Borrower to the Lender under this Note and/or any DIP Loan Documents, the Borrower shall not:

1.   Create, incur or permit to exist against any of the collateral for this LOC any mortgage, lien or encumbrance without the written consent of the Lender; and

2.   Assume, guaranty, endorse or otherwise become directly or contingently liable for the obligations of any other person, except for the endorsement

4

of negotiable instruments for deposit or collection in the ordinary course of business.

C.  **Financial Information**.  The Borrower covenants and agrees that, until the full satisfaction of the obligations and liabilities of the Borrower to the Lender under this Note and/or any DIP Loan Document, the Borrower shall provide or cause to be provided to the Lender all such financial information and data as the Lender may reasonably request from time to time request.

## VI.  DEFAULT

A.  The Borrower shall be considered in default under this Note and under all other DIP Loan Documents upon the occurrence of any one or more of the following events (each an "Event of Default"):

1.  the failure of the Borrower, or anyone else liable therefor, to pay within fifteen (15) days of any due date, whether such payment is due by acceleration, demand or otherwise, any principal, interest or any other charge due hereunder or under any other DIP Loan Document;

2.  the default of the Borrower, or anyone else responsible therefor, to fully and timely comply with all of the other terms, covenants and conditions contained herein beyond any applicable cure or grace period. or, if no grace period is expressly provided, if the default continues more than thirty (30) days after the giving of written notice thereof from Lender.  If such default is of a nature that it cannot with due diligence be cured within thirty (30) days, and the Borrower is making a good faith effort and has commenced to cure within the thirty (30) day period and is diligently pursuing completion of such cure, in the Lender's sole discretion, the Lender may give written consent for the time to cure beyond thirty (30) days for a period determined by the Lender;

3.  any representation or warranty made herein or in any other DIP Loan Document or financial statement submitted to the Lender to the Borrower proves false and/or misleading in any material respect as of the date made or deemed to be made;

4.  the occurrence of an Event of Default under the DIP Agreement and DIP Loan Documents as set forth on Schedule A hereto;

5.  any event or change in Borrower's financial condition that has or, in the Lender's judgment, is likely to have, a material adverse effect on (i) the assets or financial condition of the Borrower; (ii) the ability of Borrower to make any payment under this Note or any of the DIP Loan Documents;

5

or (iii) the ability of Lender to exercise its rights and remedies with respect to, or otherwise realize upon, any of the collateral or any of the security for the obligations of the Borrower to the Lender under this Note or any of the DIP Loan Documents;

6.  any of the DIP Loan Documents should at any time, after their respective execution and delivery, for any reason cease to be in full force and effect or shall be declared null and void or enforceability thereof shall be contested by the Borrower or the Borrower shall deny it has any further liability or obligation under any of the DIP Loan Documents.

B.  **Rights on Default.** Upon the occurrence of an Event of Default, the Lender may in its discretion:

1.  Refuse to make any Advances;

2.  Declare the entire unpaid principal balance of this Note together with accrued and unpaid interest and all other sums due hereunder and under the other DIP Loan Documents to be immediately due and payable, all without notice, demand or protest, all of which are hereby waived; and/or

3.  Proceed to exercise any or all rights and remedies that the Lender may have available to it hereunder, under the other DIP Loan Documents, or otherwise available at law or in equity, to include the right to accelerate and declare due and payable all other liabilities due the Lender by the Borrower.

C.  **Default Interest.** Upon and after the Maturity Date or the occurrence or existence of an Event of Default, in the Lender's sole discretion, the Interest Rate on the unpaid principal sum due hereunder shall accrue and be due and payable at the Default Interest rate; provided, however, that the Lender first gives written notice to Borrower of its intent to increase the rate of interest if the Event of Default is not cured within the time period specified in such notice, which time to cure shall not be less than ten (10) days. No failure to impose or delay in imposing this Default Rate shall be construed as a waiver by the Lender of its right to collect interest at such Default Interest Rate.

VII. **GENERAL CONDITIONS:**

A.  **Method of Payment**. All payments due under this Note and the other Loan Documents are payable at **201 Mohawk Avenue, Scotia, New York 12302**, or at such other place as Lender shall notify the Borrower in writing. The Lender reserves the right to require that any payment under this Note, whether such payment is of a regular installment or represents a prepayment, be by wired

6

federal funds or other immediately available funds or to be paid at a place other than the above address.  It is expressly understood that the final payment of principal and all accrued and unpaid interest and other charges then due under the Loan Documents shall be made by wired federal funds or other immediately available funds.

B.  **Application of Payments Received**.  All payments received by Lender under this Note shall be applied by the Lender as follows:

    i.  To accrued and unpaid interest then due and owing;

    ii.  To any unpaid Late Charge and any other charges due hereunder and under the other Loan Documents; and

    iii.  To the reduction of principal due under this Note.

Notwithstanding the foregoing, on and after the occurrence of an Event of Default, as hereinafter defined, the Lender may, in its sole discretion, apply all sums received in such manner as the Lender may deem appropriate.

VII.  **MISCELLANEOUS**:

A.  **Costs and Expenses Payable by Borrower.**  The Borrower shall be responsible for and shall pay all costs, including, but not limited to, reasonable attorneys' fees incurred in connection with the enforcement of any of the Lender's rights hereunder or under the DIP Loan Documents, whether or not suit or proceeding is commenced, including those incurred in any bankruptcy or insolvency proceeding.  All such costs and expenses shall be payable on demand and until paid shall be secured by the Collateral.

B.  **Right of Set Off**.  The Borrower agrees that in addition to all liens upon and rights of setoff against the moneys, securities or other property of the Borrower given to the Lender by operation of law, the Lender shall have, with respect to the Borrower's obligations to the Lender under this Note and to the extent permitted by law, a contractual possessory security interest in and a right of setoff against, and the Borrower hereby assigns, conveys, delivers, pledges, and transfers to the Lender all of the Borrower's right, title and interest in and to, all deposits, moneys, securities and other property of the Borrower now or hereafter in the possession of or on deposit with the Lender.  Every such security interest and right of setoff may be exercised upon the occurrence of an Event of Default without demand or notice to the Borrower.  No security interest or right of setoff shall be deemed to have been waived by any act or conduct on the part of the Lender or by any neglect to exercise such right to setoff or to enforce such security interest or by any delay in so doing.  Every right of setoff and security interest shall continue in full force and effect until such right of setoff or security

7

interest is specifically waived or released by an instrument in writing executed by the Lender.

C.  **No Waiver by Lender.**  No failure or delay on the part of the Lender in exercising any right, power or remedy hereunder or under any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.  No modification or waiver of any provision of this Note or any of the Loan Documents, nor any consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be In writing signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

D.  **Waiver by Borrower.**  The Borrower hereby waives presentment, protest, demand, diligence, notice of dishonor and of nonpayment, and waive and renounce all rights to the benefits of any statute of limitations and any moratorium, appraisement, and exemption now provided or which may hereafter be provided by any Federal or state statute, against the enforcement and collection of the obligations evidenced by this Note and any and all extensions, renewals and modifications hereof.

E.  **Usury Laws.**  It is the intention of the parties to conform strictly to the usury laws, whether state or Federal, that are applicable to this Note.  All agreements between the Borrower and the Lender, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration or maturity hereof or otherwise, shall the amount paid or agreed to be paid to the Lender or the holder hereof, or collected by Lender or such holder, for the use, forbearance or detention of the money to be loaned hereunder or otherwise, or for the payment or performance of any covenant or obligation contained herein, or in any of the Loan Documents, exceed the maximum amount permissible under applicable Federal or State usury laws.  If under any circumstances whatsoever fulfillment of any provision hereof or of the other Loan Documents, at the time performance of such provision shall be due, shall involve exceeding the limit of validity prescribed by law, then the obligation to be fulfilled shall be reduced to the limit of such validity; and if under any circumstances the Lender or other holder hereof shall ever receive an amount deemed interest by applicable law, which would exceed the highest lawful rate, such amount that would be excessive interest under applicable usury laws shall be applied to the reduction of the principal amount owing hereunder or to other indebtedness secured by the Loan Documents and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal and such

8

other indebtedness, the excess shall be deemed to have been a payment made by mistake and shall be refunded to Borrower or to any other person making such payment on Borrower's behalf.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Borrower and the Lender.

F.  **Governing Law; Submission to Jurisdiction.**  This Note shall be governed by, construed and enforced in accordance with the laws of the State of New York. The Borrower hereby submits to personal jurisdiction in said State of the enforcement of Borrower's obligations hereunder or under the other Loan Documents.

G.  **Waiver by Borrower of Jury Trial.  THE LENDER AND THE BORROWER HEREBY WAIVE TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS NOTE, ANY OTHER LOAN DOCUMENT OR WITH RESPECT TO THE LOC, OR ANY INSTRUMENT, AGREEMENT OR DOCUMENT DELIVERED IN CONNECTION WITH THE LOC, OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF, OR ANY OTHER CLAIM OR DISPUTE HOWSOEVER ARISING BETWEEN THE BORROWER AND THE LENDER.**

H.  **Amendments.**

1.  No amendment of this Note or any of the Loan Documents, nor any waiver or other departure from the terms provisions and conditions thereof, shall be effective against either Borrower or Lender unless the same shall be in writing and executed by the Lender or its assigns and the Borrower.

2.  The Borrower agrees to assist the Lender and/or its attorneys to amend any of the Loan Documents to correct any typographical and/or scrivener's or clerical errors made therein.  The Borrower also agrees that upon request by the Lender to deliver such documents and instruments that should have been signed by the Borrower or any guarantor hereof or are necessary or required for accurate and complete documentation of the LOC.

I.  **Notices.**  Any notices required or permitted to be given hereunder shall be: (i) personally delivered; (ii) given by registered or certified mail, postage prepaid, return receipt requested, (iii) forwarded by overnight courier service, in each instance addressed to the addresses set forth at the head of this Note, or such other addresses as the parties may for themselves designate in writing as provided herein for the purpose of receiving notices hereunder; or (iv) with respect to requests for Advances, by facsimile with delivery confirmed by confirmation report or by electronic mail if receipt confirmed by the recipient.  All notices shall be in writing and shall be deemed given, in the case of appropriate mail or courier

9

service, upon deposit with the U.S. Postal Service or delivery to the courier service.

J.     **Liability of Borrower.**  If there is more than one Borrower, their liability shall be joint and several hereunder.

K.     **Entire Agreement.**  This Note and the Loan Documents and any exhibits or other documents referred herein or therein, constitute the complete understanding of the parties with respect to the subject matter referred to herein and therein and shall supersede all prior or contemporaneous negotiations, promises, covenants, agreements or representations of every nature whatsoever with respect thereto, all of which have become merged and finally integrated into this Note and the Loan Documents.

L.     **Binding Effect.**  This Note shall be binding upon the Borrower and its successors and assigns and shall inure to the benefit of the Lender and its successors and assigns.

M.     **Amendment.**  This Note may only be amended, modified or changed only by a written agreement signed by the Lender and the Borrower.

N.     **Paragraph Headings**.  The paragraph headings contained herein are for convenience in reference only and shall not be deemed to alter, amend, explain, expand, restrict or otherwise affect any term or provision of this Note.

O.     **Signatures.** A signed copy of this Note delivered by electronic means, including but not limited to PDF, email transmission, or via an electronic signature platform such as DocuSign, Adobe Sign, or similar service, shall be deemed to have the same legal effect as delivery of an original signed copy. The parties agree that electronic signatures shall be deemed to be original signatures for all purposes under this Note and shall be binding to the same extent as handwritten signatures.

[Signature appears on the following page.]

10

**IN WITNESS WHEREOF,** the Borrowers have executed this instrument as of the day, month and year first above written.

**BORROWER:**                    **GOODBEAR PROPERTY LLC**

By: _____
         Jaclyn M. Iarossi,
          Authorized Member


**ATLAS LAND HOLDINGS, LLC**

By: _____
         Jaclyn M. Iarossi,
          Authorized Member

11

# COMMERCIAL GUARANTY

| | |
|---|---|
| **BORROWER:** | **ATLAS LAND HOLDINGS, LLC**<br>5 Hilltop Lane<br>Brewster, New York 10509 |
| | **GOODBEAR PROPERTY LLC**<br>5 Hilltop Lane<br>Brewster, New York 10509 |
| **GUARANTOR:** | **JACLYN M. IAROSSI**<br>5 Hilltop Lane<br>Brewster, New York 10509 |

---

**DEFINITIONS**.  The following words shall have the following meanings when used in this Guaranty:

**Borrower**.  The word "Borrower" shall mean the entities set forth in the heading above.

**Guarantor**.  The word "Guarantor" shall mean the person set forth in the heading above.

**Guaranty**.  The word "Guaranty" means this Guaranty made by Guarantor for the benefit of Lender.

**Indebtedness**.  The word "Indebtedness" is used in its most comprehensive sense and means and includes any and all of Borrower's liabilities, obligations, debts, and indebtedness to Lender incurred in connection with that certain: (i) Debtor in Possession Revolving Line of Credit Note (Secured) by and between Atlas Land Holdings, LLC, Goodbear Property LLC and Lender; and (ii) Overdraft Repayment Demand Note by and between Goodbear Property LLC and Lender.

**Lender**.  The word "Lender" means First National Bank of Scotia, a national banking corporation duly organized and existing under the laws of the United States of America, having its principal place of business at 201 Mohawk Avenue, Scotia, New York 12302, its successors and assigns.

**Related Documents**.  The words "Related Documents" mean and include without limitation all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties,  security agreements, mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed by the Borrower to evidence or collateralize the Indebtedness.

{LG 00941462 1 }

1

**AMOUNT OF GUARANTY**.  The amount of this Guaranty is 100% of all amounts due now or later from Borrower to Lender on account of the Indebtedness, including, but not limited to, the obligations incurred by the Borrower on even date herewith.

**CONTINUING UNLIMITED GUARANTY**.  For good and valuable consideration, Guarantor absolutely and unconditionally guarantees and promises to pay to Lender or its order, in legal tender of the United States of America, an amount up to 100% of the Indebtedness of Borrower on the terms and conditions set forth in this Guaranty.

**NATURE OF GUARANTY**.  Guarantor's liability under this Guaranty shall be open and continuous for so long as this Guaranty remains in force.  Guarantor intends to guarantee at all times the performance and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of all Indebtedness to the extent provided above. Nothing herein is meant to abrogate or otherwise amend, nullify or render invalid prior guaranty given by Guarantor to Lender or any prior guaranty given by any other party to Lender with respect to Borrower's other obligations to Lender which are in addition to the Indebtedness.

**DURATION OF GUARANTY**.  This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all other obligations of Guarantor under this Guaranty shall have been performed in full.  If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing.  Guarantor's written notice or revocation must be delivered to Lender at the address of Lender listed above or such other place as Lender may designate in writing.  Written revocation of this Guaranty will apply only to advances or new Indebtedness created after actual receipt by Lender of Guarantor's written revocation.  For this purpose and without limitation, the term "new Indebtedness" does not include Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due.  This Guaranty will continue to bind Guarantor for all Indebtedness incurred by Borrower or committed by Lender prior to receipt of Guarantor's written notice of revocation, including any extensions, renewals, substitutions or modifications of the Indebtedness.  All renewals, extensions, substitutions, and modifications of the Indebtedness granted after Guarantor's revocation, are contemplated under this Guaranty, and, specifically will not be considered to be new Indebtedness.

This Guaranty shall bind the estate of Guarantor as to Indebtedness created both before and after the death or incapacity of Guarantor, regardless of Lender's actual notice of Guarantor's death.  Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect.  It is anticipated that fluctuations may occur in the aggregate amount of Indebtedness covered by this Guaranty, and it is specifically acknowledged and agreed by Guarantor that reductions in the amount of Indebtedness, even to zero dollars ($0.00), prior to written revocation of this guaranty by Guarantor shall not constitute a termination of this Guaranty.  This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the guaranteed Indebtedness remains unpaid and even though the Indebtedness guaranteed may from time to time be zero dollars ($0.00).

{LG 00941462 1 }

2

**GUARANTOR'S AUTHORIZATION TO LENDER**. Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time:  (a) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (b) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions  may be repeated and may be for longer than the original loan term; (c) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, fail or decide not to perfect, and release any such security, with or without  the substitution of new collateral; (d) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other Guarantors on any terms or in any manner Lender may choose; (e) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (f) to apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (g) to sell, transfer, assign, or grant participations in all or any part of the Indebtedness; and (h) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES**.  Guarantor represents and warrants to Lender that to the best of Guarantor's knowledge (a) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (b) this Guaranty is executed at Borrower's request and not at the request of Lender; (c) Guarantor has not and will not, without the prior written consent of Lender, which consent shall not be unreasonably withheld or delayed, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets; (d) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; (e) upon Lender's request, Guarantor will provide to Lender financial and credit information in form reasonably acceptable to Lender, and all such financial information provided to Lender is true and correct in all material respects and fairly presents the financial condition of Guarantor as of the dates thereof, and no material adverse change has occurred in the financial condition of Guarantor since the date of the financial statements; and (f) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition.  Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS**. Except as prohibited by applicable law, Guarantor waives any right to require Lender (a) to continue lending money or to extend other credit to Borrower; (b) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or non action on the part of Borrower, Lender, any surety, endorser, or other Guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (c) to resort for payment or to proceed directly or at once against any person, including Borrower or any

{LG 00941462 1 }

3

other Guarantor; (d) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other Guarantor, or any other person; (e) to pursue any other remedy within Lender's power; or (f) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

If now or hereafter (a) Borrower shall be or become insolvent, and (b) the Indebtedness shall not at all times until paid be fully secured by collateral pledged by Borrower, Guarantor hereby forever waives and relinquishes in favor of Lender and Borrower, and their respective successors, any claim or right to payment Guarantor may now have or hereafter have or acquire against Borrower, by subrogation or otherwise, so that at no time shall Guarantor be or become a "creditor" of Borrower within the meaning of 11 U.S.C. section 547(b), or any successor provision of the Federal bankruptcy laws.

Guarantor also waives any and all rights or defenses arising by reason of (a) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (b) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (c) any disability or other defense of Borrower, of any other Guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (d) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (e) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced there is outstanding Indebtedness of Borrower to Lender which is not barred by any applicable statute of limitations; or (f) any defenses given to Guarantors at law or in equity other than actual payment and performance of the Indebtedness.  If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS**.  Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law.  If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**LENDER'S RIGHT OF SETOFF**.  In addition to all liens upon and rights of setoff against the

{LG 00941462 1 }

4

moneys, securities or other property of Guarantor given to Lender by operation of law, Lender shall have, with respect to Guarantor's obligations to Lender under this Guaranty and to the extent permitted by law, a contractual possessory security interest in and a right of setoff against, and Guarantor hereby assigns, conveys, delivers, pledges, and transfers to Lender all of Guarantor's right, title and interest in and to, all deposits, moneys, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender, whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding however all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to Guarantor. No security interest or right of setoff shall be deemed to have been waived by any act or conduct on the part of Lender or by any neglect to exercise such right to setoff or to enforce such security interest or by any delay in so doing. Every right of setoff and security interest shall continue in full force and effect until such right of setoff or security interest is specifically waived or released by an instrument in writing executed by Lender.

**FINANCIAL INFORMATION.** So long as the Indebtedness shall be outstanding, each Guarantor shall provide to the Lender on or before April 15 of each year, or within thirty (30) days of filing under proper extension(s) or thirty (30) days of written request by the Lender, a signed current personal financial statement in the form as prescribed by the Lender, and copies of such Guarantor's federal income tax returns, plus all schedules and supporting documentation, certified by each Guarantor regarding his/her respective submissions as being true and accurate.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR**. Guarantor agrees that the Indebtedness of Borrower to Lender, whether now existing or hereafter created, shall be prior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the indebtedness of Borrower to Lender. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender hereby is authorized, in the name of Guarantor, from time to time to execute and file financing statements and continuation statements and to execute such other documents and to take such other actions as Lender deems reasonably necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS**. The following miscellaneous provisions are a part of this Guaranty:

> **Amendments**: This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No

alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Applicable Law**. This Guaranty has been delivered to Lender and accepted by Lender in the State of New York. If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Warren County, State of New York. Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other. This Guaranty shall be governed by and construed in accordance with the laws of the State of New York.

**Attorneys' Fees: Expenses**. Guarantor agrees to pay upon demand all of Lender's costs and expenses, including reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (and including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the Court.

**Notices**. Except for revocation notices by Guarantor, all notices required to be given by either party to the other under this Guaranty shall be in writing and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier, or when deposited in the United States mail, first class postage prepaid, addressed to the party to whom the notice is to be given at the address shown above or to such other addresses as either party may designate to the other in writing. All revocation notices by Guarantor shall be in writing and shall be effective only upon delivery to Lender as provided above in the section titled "DURATION OF GUARANTY." If there is more than one Guarantor, notice to any Guarantor will constitute notice to all Guarantors. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address.

**Interpretation**. In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty. If a court of competent jurisdiction finds any provision of this Guaranty to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances, and all provisions of this Guaranty in all other respects shall remain valid and enforceable. If any one or more of Borrower or Guarantor are corporations or partnerships, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, or agents acting or purporting to act on their behalf, and any Indebtedness made or created in

reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Waiver**. Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender, except as otherwise provided herein to the contrary.

**Signature.** A signed copy of this Agreement delivered by electronic means, including but not limited to PDF, email transmission, or via an electronic signature platform such as DocuSign, Adobe Sign, or similar service, shall be deemed to have the same legal effect as delivery of an original signed copy. The parties agree that electronic signatures shall be deemed to be original signatures for all purposes under this Agreement and shall be binding to the same extent as handwritten signatures.

**OTHER CONDITIONS**. All other agreements, either oral or written, are superseded by this "document", there are no terms, representations, or conditions relating to the loan or other matters relating thereto that are not contained in this document and the Borrower specifically affirms that it is not relying upon any such terms, representations, or conditions.

[Signature on the following page]

{LG 00941462 1 }

**THE UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS.  IN ADDITION, GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY."  NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE.  THIS GUARANTY IS DATED AS OF APRIL 30TH, 2026.**

**GUARANTOR:**

**Jaclyn M. Iarossi**, **Individually**

## **EXHIBIT 2**

### **30-Day Budget**

# Friends Lake Inn Operating Budget
*May 1st - May 30th 2026*

| Section | Category | Actuals | 15-Day Budget | 30-Day Budget | Var 15-Day $ | Var 15-Day % | Var 30-Day $ | Var 30-Day % | Assumptions |
|---|---|---|---|---|---|---|---|---|---|
| REVENUE | | *May 2025* | | | | | | | |
| | Restaurant Sales | $19,533 | $8,301 | $16,603 | -$11,231 | -57.50% | -$2,930 | -15.00% | 15% decrease; 15-day = 50% |
| | Event/Hotel Sales | $74,510 | $31,667 | $63,333 | -$42,843 | -57.50% | -$11,176 | -15.00% | 15% decrease; 15-day = 50% |
| | **Total Revenue** | **$94,043** | **$39,968** | **$79,936** | **-$54,075** | **-57.50%** | **-$14,106** | **-15.00%** | |
| COGS | | | | | | | | | |
| | Alcohol COGS | $5,112 | $2,798 | $5,596 | -$2,314 | -45.27% | $484 | 9.47% | 7%          Sales |
| | Food COGS | $2,225 | $3,597 | $7,194 | $1,372 | 61.67% | $4,969 | 223.33% | 9%          Sales |
| | Beverage COGS | $1,202 | $250 | $500 | -$952 | -79.20% | -$702 | -58.40% | Avg. 4 month est |
| | **Total COGS** | **$8,539** | **$6,645** | **$13,290** | **-$1,894** | **-22.18%** | **$4,751** | **55.64%** | |
| PAYROLL | | | | | | | | | |
| | Salaries & Wages | $48,795 | $26,114 | $48,795 | -$22,681 | -46.48% | $0 | 0.00% | Weekly cycle mapping |
| | Payroll Taxes | $18,502 | $9,671 | $18,502 | -$8,831 | -47.73% | $0 | 0.00% | Weekly cycle mapping |
| | **Total Payroll** | **$67,565** | **$35,785** | **$67,298** | **-$31,780** | **-47.04%** | **-$267** | **-0.40%** | |
| OPERATING EXPENSES | | | | | | | | | |
| | Accounting | | $4,400 | $4,400 | | | | | Past due accountant |
| | Bank Fees | $1,761 | $500 | $999 | -$1,261 | -71.62% | -$761 | -43.25% | 1.25%          Sales |
| | Equipment Rental | $200 | $700 | $700 | | | | | Dishwasher (500 delivery fee) |
| | Insurance | $3,820 | $1,910 | $4,000 | -$1,910 | -50.00% | $180 | 4.72% | No change |
| | Laundry Services | | | $1,750 | | | | | |
| | Management Co. | $0 | $4,400 | $13,700 | $4,400 | | | | Flat monthly fee Plus GM fee (3500 travel & $900/week salary for 3 weeks) |
| | Marketing | $995 | $899 | $10,800 | -$96 | -9.62% | $9,805 | 985.73% | ~$800 additional + 9k for wedding wire |
| | Merchant Fees | $88 | $600 | $1,399 | $512 | 584.54% | $1,311 | 1496.12% | 1.75%          sales |
| | Miscellaneous | $1,200 | $600 | $1,200 | -$600 | -50.00% | $0 | 0.00% | No change |
| | Repairs & maintenance | | | $2,250 | | | | | |
| | Software & Apps | $1,295 | $648 | $1,250 | -$648 | -50.00% | -$45 | -3.48% | No change |
| | Supplies | $1,131 | $622 | $1,350 | -$509 | -45.00% | $219 | 19.31% | +10% |
| | Utilities | | $4,000 | $6,569 | | | | | Buckman, Apr.25 nat grid, casella, spectrum, Water testing |
| | **Total OpEx** | **$11,540** | **$19,278** | **$50,367** | **$7,739** | **67.06%** | **$38,827** | **336.47%** | |
| EVENT VENDORS | | | | | | | | | |
| | Event Vendors | $6,200 | $3,100 | $4,750 | -$3,100 | -50.00% | -$1,450 | -23.39% | Seasonal swings |
| TAXES | | | | | | | | | |
| | Occupancy Tax | | $1,267 | $2,533 | | | | 4.00% | 4% of Event/Hotel Sales |
| | Sales Tax | | $2,798 | $5,596 | | | | 7.00% | 7% of Total Revenue |
| | **Total Taxes** | | **$4,064** | **$8,129** | | | | | |
| CAPEX | | | | | | | | | |
| | CapEx | | $3,750 | $7,500 | | | | | Flat allocation |
| BANKRUPTCY EXPENSES | | | | | | | | | |
| | Legal Fees | | | | | | | | |
| | Bank Payments | | | | | | | | |
| | U.S. Trustee fees | | | | | | | | paid Qtrly - M1 |
| | **Total Bankruptcy Fees** | | **$0** | **$0** | | | | | |
| NET OPERATING INCOME | | | | | | | | | |
| | Total Revenue | | $39,968 | $79,936 | | | | | |
| | Total Expenses | | $72,623 | $151,334 | | | | | |
| | **Net Operating Income** | | **-$32,655** | **-$71,397** | | | | | |